Gregory FINGER, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 49S02–0311–CR–587.

Supreme Court of Indiana.

Nov. 26, 2003.

Kathleen M. Sweeney, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

BOEHM, Justice.

This is an interlocutory appeal from the trial court's denial of a motion to suppress evidence. Finger contends he was subjected to an unlawful detention when an officer investigating his parked car retained his driver's license. The trial court ruled that Finger had not been detained, but the Court of Appeals reversed, holding that the investigating officer's retention of Finger's driver's license constituted detention. We agree that retention of a driver's license can constitute detention, but find that the officer had reasonable suspicion to justify an investigative stop under the facts of this case. We grant transfer and affirm the trial court.

**Factual and Procedural Background**

At around 10:30 p.m. on September 18, 2000, Officer Richard Young of the Butler University Police Department received a police dispatch relaying the report by a concerned citizen of a suspicious vehicle at the intersection of 56th Street and Meridian Street in Indianapolis. Young found a car with two occupants parked just west of the intersection and partially in a driving lane of 56th street. After placing his university police car behind the vehicle and activating his emergency lights, Young approached the vehicle and found Gregory Finger sitting in the driver's seat and Michael Crosby in the passenger seat.

Young asked "what was happening" and whether Finger needed any assistance. Finger responded that the car was out of fuel and that a passerby would be returning soon with more gasoline. Young knew that a filling station was around the corner, less than two blocks away, and observed that the fuel gauge indicated ap-

proximately one eighth of a tank. Young thought Finger seemed nervous, though a stranded motorist would be expected to be relieved to receive the assistance of a police officer. As Young carried on a general conversation with Finger and his passenger, Finger's explanation for his presence changed. Young then asked for and received Finger's and Crosby's driver's licenses and ran warrant and license checks. Both came back negative. Young then continued to carry on a conversation with Finger. As Young testified, Finger "[wasn't] going anywhere" if he was out of fuel. However, Young did not return the driver's licenses and never told Finger or Crosby that they either were or were not free to leave. Young also testified that further conversation with Finger produced inconsistencies in the information Finger was providing, but he did not elaborate what these were on direct or cross-examination. When Young asked about a knife on the back seat and ammunition in the front seat of Finger's vehicle, both in plain view, Finger and Crosby responded that they did not know why these items were in the car or to whom they belonged. Young testified that this explanation made him suspicious, though at that point he did not know that any crime had been committed.

Fifteen to twenty minutes after Young first encountered Finger, Young heard a radio report of an armed robbery at a liquor store less than one block from the car. At this point, Young asked the pair to exit the car and read them *Miranda* rights. Next, based on safety concerns, he retrieved the ammunition and knife from the car. In the meantime, Indianapolis Police Department officers had been sent to the liquor store in response to the robbery call and learned possible suspects were at 56th and Meridian Street. When they arrived at Finger's car, Young turned the situation over to them. After a witness to the robbery identified Crosby as one of the men in the store, Finger and Crosby were handcuffed and taken to the police station.

Finger was eventually charged with the robbery of the liquor store. He was alleged to be the driver of the car for Crosby and another man, both of whom had entered the store. The State charged Finger with conspiracy to commit robbery,[1] two counts of robbery,[2] and two counts of criminal confinement,[3] all class B felonies.

Finger moved to suppress both the statements he made to IPD officers at Police Headquarters and the knife and ammunition seized at the scene.[4] Finger argued that Young's initial encounter was unjustified as an investigative stop under both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. He claimed further that even if the initial encounter was not an investigative stop, the continued interaction with Young rose to the level of a stop. The trial court denied Finger's motion to suppress, finding that Officer Young's initial approach to Finger's vehicle and his interaction with Finger until the point of the robbery call did not constitute an investigative stop. The court reasoned that the encounter was consensu-

1. Ind.Code §§ 35–41–5–2, 35–42–5–1 (1998).

2. I.C. § 35–42–5–1.

3. I.C. § 35–42–3–3.

4. Finger challenges the admissibility of his statements to IPD officers, claiming the state-

ments were involuntary by reason of his intoxication. The trial court found otherwise based on testimony of the investigating officers. Finger points to no specific evidence on this point. His general claim that he was intoxicated is insufficient to overcome the trial court's finding on this factual issue.

al because Officer Young was attempting to assist a possibly stranded vehicle. The court found that Young did detain Finger after receiving the robbery call. The court determined this detention to be lawful because, at that time, Young knew of specific and articulable facts sufficient to give rise to reasonable suspicion of criminal activity. The court reasoned that reasonable suspicion existed because Young smelled alcohol on Finger's breath, Young heard a radio report that a robbery had been committed at the liquor store less than a block away from Finger's parked car, and Young found inconsistencies in information provided to Young by Finger and Crosby as to what they were doing in the area. The trial court found that no arrest had occurred before the IPD officers arrived at the scene. The ruling was certified for interlocutory appeal and the Court of Appeals reversed, concluding that Young detained Finger when he retained Finger's driver's license and that at that point Young did not have the necessary reasonable suspicion to execute a lawful investigative stop.

## I. Finger's Fourth Amendment Claim

### A. *Young's status as a state actor*

■ We note initially that Young's actions as a Butler University Police Officer are subject to constitutional constraints. A private entity is deemed a state actor when the state delegates to it a traditionally public function. *Wade v. Byles,* 83 F.3d 902, 905 (7th Cir.1996). By statute the state has conferred "general police powers" on Butler University Police officers. Ind.Code §§ 20–12–3.5–1(1) and –2 (1998). This renders Young a state actor subject to the Fourth Amendment restrictions on searches and seizures. *See Henderson v. Fisher,* 631 F.2d 1115, 1119 (3d Cir.1980) ("[t]he delegation of police powers, a government function, to the campus police

buttresses the conclusion that the campus police act under color of state authority.").

### B. *Detention*

■ The Fourth Amendment regulates nonconsensual encounters between citizens and law enforcement officials and does not deal with situations in which a person voluntarily interacts with a police officer. A full-blown arrest or a detention that lasts for more than a short period of time must be justified by probable cause. A brief investigative stop may be justified by reasonable suspicion that the person detained is involved in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Fourth Amendment claim turns on whether Young and Finger were initially involved in a consensual encounter or were detained. At the point at which a detention occurred, the issue is whether it was excessive in light of the developments at that point.

■ Detention turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business. *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Initially, Finger stated that he had run out of gas. If this were true, it may have been enough to show that Young did not restrain Finger's liberty. If a person's freedom to leave is restricted by something other than police authority, it cannot be said that the police detained the person. *See Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *INS v. Delgado,* 466 U.S. 210, 218, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). However, it appears that Finger's car was in fact not out of fuel, and Young observed that.

It is debatable whether Finger's claim of lack of gasoline, which the officer believed to be false, is sufficient to render

his detention voluntary. We find no relevant authority. The only factor Finger identifies as restraining him after his initial exchange with Young was the fact that Young obtained and then retained Finger's driver's license. Young's other actions, taken together, would not lead a reasonable person to feel that he was not free to leave. Young parked behind Finger's vehicle, activated his emergency lights and proceeded to ask a few questions, including whether Finger needed assistance. These are all things a police officer would be expected to do upon finding a stranded motorist and do not indicate to a reasonable motorist that the officer intends to detain him. However, when Young returned to Finger's car after running license checks and did not return his identification, what arguably began as a consensual encounter evolved into an investigative stop.

The Seventh Circuit has concluded that, "[o]fficers' retaining airline tickets and driver's licenses has been a crucial factor in finding that a seizure has occurred. Suspects deprived of their ticket and identification are effectively deprived of the practical ability to terminate the questioning and leave." *United States v. Borys,* 766 F.2d 304, 310 (7th Cir.1985). The Eleventh Circuit has specifically held that when an officer retains an individual's driver's license, the individual has effectively been detained. *United States v. Thompson,* 712 F.2d 1356, 1359 (11th Cir. 1983). The court reasoned, "[w]ithout his driver's license Thompson was effectively immobilized. A reasonable person under these circumstances would not consider himself free to leave. If Thompson had tried to drive away, he could have been arrested for driving without a license." *Id.* Finger's claim of lack of fuel adds a factor that arguably renders his detention voluntary. However, we agree that like Thompson, a reasonable person in Finger's

position would not feel free to leave after Young retained his identification. At least theoretically, Finger could have abandoned his car and walked away or recanted his story of lack of fuel. Finger was therefore detained for purposes of the Fourth Amendment.

### C. *Reasonable Suspicion*

██ Although we agree with the Court of Appeals that Young's retention of the driver's license converted a consensual encounter into an investigative stop, we conclude that at that point Young had reasonable suspicion to detain Finger for a brief investigative period, and therefore did not violate the Fourth Amendment. The reasonable suspicion inquiry is highly fact-sensitive and is reviewed under a sufficiency of the evidence standard. Like any matter of sufficiency of the evidence, "[t]he record must disclose substantial evidence of probative value that supports the trial court's decision. We do not reweigh the evidence and we consider conflicting evidence most favorably to the trial court's ruling." *Goodner v. State,* 714 N.E.2d 638, 641 (Ind.1999) (citations omitted). Here, Young observed inconsistencies in Finger's responses, nervousness, and improbable explanations. The trial court finding here was that there was no detention, so we have no trial court finding as to reasonable suspicion. However, the result the trial court reached is proper even though detention occurred before the radio report of the robbery. We do not agree with the dissent that the officer's reasonable suspicion relies on facts occurring after the detention.

██ Reasonable suspicion to justify an investigative stop must be based on specific and articulable facts known to the officer at the time of the stop that lead the officer to believe that "criminal activity may be

afoot." *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Reasonable suspicion requires more than mere hunches or unparticularized suspicions. *Id.* at 27, 88 S.Ct. 1868. An officer must be able to point to specific facts giving rise to reasonable suspicion of criminal activity. In this case, at the time he detained Finger, Young testified that he relied on the following facts: (1) Finger's car was reported as a "suspicious"; (2) although Finger claimed the car was out of fuel, and someone had gone for gasoline, a gas station was around the corner and the fuel gauge indicated that there was one eighth of a tank of fuel remaining in the car; (3) Finger told other inconsistent stories during his conversation with Young; (4) there was a folded pocket-knife in the car; and (5) Finger and his passenger were "acting nervous."

■ The first of these, being based solely on an anonymous tip, is of little value. A report that describes a suspicious car, but gives no further information, is insufficient to create reasonable suspicion. *United States v. Packer,* 15 F.3d 654, 659 (7th Cir.1994). In *Packer,* three Milwaukee police officers responded to a call regarding a suspicious car with fogged up windows parked along a street in the early hours of the morning. *Id.* at 655. In finding reasonable suspicion lacking, the court explained, "the record does not suggest any specific irregularities in the car, other than the windows being all fogged up with the four individuals sitting inside." *Id.* at 658. The court also pointed out that the phone call reporting the suspicious car did not provide enough information to raise reasonable suspicion because the caller did not indicate knowledge of any criminal activity. *Id.* at 659. The court concluded, "[i]n order to protect the constitutionally guaranteed rights of us all, the minimum threshold of 'specific and articulable facts' sufficient to give rise to

reasonable suspicion must be higher, albeit marginally, than those presented here." *Id.*

■ Young, like the officers in *Packer,* could not rely solely on the report by a concerned citizen of a "suspicious car." And taken individually, any one of the remaining facts might not be enough to give rise to reasonable suspicion. However, a set of individually innocent facts, when observed in conjunction, can be sufficient to create reasonable suspicion of criminal activity. *United States v. Arvizu,* 534 U.S. 266, 277–78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). We think this is the case here.

■ First, Young pointed out the inconsistencies in Finger and his companion's responses to his questions. Specifically, Finger first claimed his vehicle was out of fuel, but Young found the fuel gauge registering no shortage. Second, the explanations that Finger and his passenger provided for their presence in the street were inconsistent. Deceptive responses may contribute to reasonable suspicion of criminal activity. *See United States v. Lebrun,* 261 F.3d 731, 733 (8th Cir.2001). Some courts have found nervousness on the part of the occupants is a factor leading an officer to form reasonable suspicion of criminal activity. *See, e.g., United States v. Kopp,* 45 F.3d 1450, 1454 (10th Cir.1995). However, we place little weight on that fact alone. As the Tenth Circuit explained, "nervousness is of limited significance when determining reasonable suspicion ... it is common for most people 'to exhibit signs of nervousness when confronted by a law enforcement officer' whether or not the person is currently engaged in criminal activity." *United States v. Salzano,* 158 F.3d 1107 (10th Cir.1998) (quoting *United States v. Wood,* 106 F.3d 942, 948 (10th Cir.1997)). Here, however, we have more than mere ner-

vousness. The occupants of the car offered an implausible explanation for their presence and were deceptive with Officer Young. In conjunction with their "nervous" behavior, these facts generated reasonable suspicion that something was afoot. Subsequent report of a robbery in the immediate vicinity justified brief detention for further investigation.

▆▆▆ Finally, Finger points out that Young's detention lasted approximately 20 minutes before the robbery call, and argues therefore that the stop was too long to be justified under the facts known to Young. We agree that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), but find that the detention in this case was reasonable. During this investigative stop, Young questioned Finger and observed his responses. These responses did not dispel Young's suspicion. To the contrary, they justifiably compounded his concern. Within a few minutes, given all of these factors, it is arguable that probable cause for an arrest existed even before IPD officers arrived. In any event, identification of Crosby by a witness established probable cause.

## II. Finger's Indiana Constitutional Claim

▆▆▆ In addition to claiming a violation of his rights under the United States Constitution, Finger also asserts violation of Article I, Section 11 of the Indiana Constitution. Under this section, the State is required to show that, in the totality of the circumstances, the intrusion was reasonable. *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind.1999) (citing *Brown v. State*, 653 N.E.2d 77 (Ind.1995)). Under this analysis, the State must show that the facts at the time, along with the reasonable inferences arising from those facts, would justify a prudent person in believing that a crime has been or is about to be committed. *Id.* (citing *Taylor v. State*, 639 N.E.2d 1052, 1054 (Ind.Ct.App.1994)). In this case, the factors leading to reasonable suspicion, discussed earlier, also satisfy the requirements of the Indiana Constitution because they could lead an ordinarily prudent person to believe that criminal activity was afoot.

For these reasons this Court finds that Young detained Finger at the time he retained his driver's license. Furthermore, we find that based on the facts known to him at the time, Young had reasonable suspicion to believe that Finger might be involved in criminal activity. Therefore, Young was justified in briefly detaining Finger for further investigation. When the report of the robbery was received, additional inquiry was justified. The arrival of IPD police and subsequent identification of Crosby by a witness constituted probable cause to arrest the pair.

### Conclusion

We grant transfer and affirm the decision of the trial court.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

RUCKER, J., dissents with separate opinion.

RUCKER, Justice, dissenting.

I agree with the majority that when Officer Young retained Finger's driver's license, what began as a consensual encounter evolved into an investigatory stop. However, I do not agree that at that point Officer Young had reasonable suspicion to detain Finger. Therefore I dissent.

The sequence of events in this case is important for a proper evaluation of

whether Officer Young had reasonable suspicion to detain Finger. The majority contends that at the point Finger was detained, Officer Young knew the following: (1) Finger's car was reported as "suspicious"; (2) although Finger claimed the car was out of fuel, and someone had gone for gasoline, a gas station was around the corner and the fuel gauge indicated that there was one eighth of a tank of fuel remaining in the car; (3) Finger told other inconsistent stories during his conversation with Young; (4) there was a folded pocketknife in the car; and (5) Finger and his passenger were "acting nervous";

The majority correctly points out that item one is of little value. "A report that describes a suspicious car, but gives no further information is insufficient to create reasonable suspicion." Op. at 534. As for the remaining items the record shows that at the point Officer Young retained Finger's driver's license, he was aware only of items two and four: Finger was not actually out of gas, and a folded pocketknife was in the back seat of the car. Officer Young testified as follows:

Q. And why were you dispatched to the corner near the area of 56th and Meridian?

A. I was advised by our control operator that a concerned citizen had called in on a suspicious vehicle with two subjects sitting inside the vehicle at this corner of 56th and Meridian.

Q. What did you find when you responded?

A. On the—I believe it was the southeast corner of this intersection I found a large older model vehicle sitting on the south curb east of Meridian Street with two black male occupants.

Q. Okay . . . what did you do when you got there?

A. I activated my emergency equipment—being that this is at an intersection and approached the vehicle to ascertain if I could offer any assistance.

Q. All right—who—did you speak with[,] anybody?

A. Yes, I did.

Q. Who did you speak with?

A. I believe a Mr. Finger was sitting in the driver's position and I believe I spoke with him first.

Q. Okay. What did he tell you?

A. I believe my question to him was something to the effect of—you know—what—what was the situation—what was happening. He advised that the vehicle was out of gas. And that someone was going to retrieve gas for him.

Q. All right, did he tell you who?

A. He just [said] a passerby.

Q. Okay. What did you do at that point?

A. I obtained identification, ran wanted checks, license checks—just as a standard procedure that we do.

Q. All right. Did anything come back when you did?

A. I—I don't believe there was any wanted information. And I don't recall the—the license status. I would have to check my notes.

Q. Okay. So what did you do after you ran their checks to see if there were any warrants out for them?

A. I returned to the vehicle to speak further with them, ask if—if there was anything I could help them with—where they were going—where they were coming from—just general conversation.

R. at 6–7. It was at this point Officer Young testified, "The conversation that I recall . . . somewhat devi[ated] from what they had originally stated. The stories they were giving weren't quite adding up. I don't—I do not recall the exact conversation that was—ensued." *Id.* at 9. The

record then shows that two more Butler University Police Officers arrived on the scene, followed shortly by officers of the Indianapolis Police Department. By then, the officers had overheard a call of a robbery about a block away. Because of the alleged inconsistency in the stories and the report of the robbery, the officers decided to detain Finger and his passenger. The following testimony by Officer Young is instructive:

> Q. Okay, do you recall whether IPD arrived before you decided that you wanted to detain these persons because of the robbery or after?
>
> A. It was within a close proximity of time. I'm—I believe it was—I believe we detained them before they arrived.
>
> Q. Okay ...
>
> A. But it was within a close proximity of time.
>
> Q. Is there any other reason that you decided to detain these persons besides the fact that their stories were inconsistent and the proximity and the closeness of the call?
>
> A. Well, they weren't going anywhere. They stated they were out of gas.

*Id.* at 11.

Contrary to the majority's recitation of facts, Officer Young's testimony makes clear that Finger telling inconsistent stories and Finger and his passenger "acting nervous" occurred *after* Finger had been deprived of his driver's license, and thus after he had already been detained for purposes of the Fourth Amendment. That leaves only two facts known to Officer Young at the time Finger was detained that could support the notion that the officer had reasonable suspicion to believe criminal activity was afoot: (1) Finger lied about being out of gas, and (2) Young observed a folded pocketknife in the back seat of the car. Nothing in this record suggests that the pocketknife was contraband or that it had been used in the commission of a crime. As for Finger's lack of truthfulness, although a deceptive response may contribute to reasonable suspicion of criminal activity, *see United States v. Burton,* 288 F.3d 91, 105 (3d Cir.2002), it is not enough standing alone. Because no reasonable suspicion existed in this case, Officer Young's investigatory stop was illegal. Accordingly, the decision of the trial court denying Finger's motion to suppress evidence seized as a result of the stop should be reversed.