**STATE of Indiana, Appellant–Plaintiff,**

v.

**Kelvin CALMES, Appellee–Defendant.**

**No. 02A03–0802–CR–56.**

Court of Appeals of Indiana.

Sept. 18, 2008.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorney for Appellant.

## OPINION ON REHEARING

BROWN, Judge.

The State of Indiana appealed the trial court's grant of a motion to suppress filed by Kelvin Calmes. The State raised one issue, which we revised and restated as whether the trial court erred when it granted the motion to suppress. We reviewed this issue in an unpublished memorandum decision and affirmed the trial court's grant of the motion to suppress. *See State v. Calmes*, No. 02A03–0802–CR–56, slip op. at 7, 889 N.E.2d 403 (Ind.Ct. App. June 27, 2008). The State subsequently filed a petition for rehearing. We reaffirm our opinion but grant the State's petition for rehearing to address the State's rehearing argument that our reliance on *Finger v. State*, 799 N.E.2d 528 (Ind.2003), was misplaced.

The relevant facts, as stated in our memorandum decision, follow. On August 18, 2007, Calmes was at a gas station "hanging out by the pay phone." Transcript at 9. Fort Wayne Police Department Officers Shane Pulver and Phillip Ealing, who were patrolling the area in a squad car, had been watching Calmes intermittently for about forty-five minutes. When they observed Bridgett Holman standing near him, they pulled up, exited the squad car, asked Calmes and Holman what they were doing there, and requested identification. Calmes gave Officer Ealing his identification, but Holman explained that she did not have her identification with her and volunteered that she "was going through a relapse ... for her addiction." *Id.* at 18. Officer Pulver wrote down her "identification information" and gave it to Officer Ealing, who returned to the squad car to "run their names through the in car computer." *Id.* at 20, 26.

While they were waiting, Officer Pulver, who was standing three to four feet away from Calmes, asked him if he had any weapons. Calmes responded that he had a knife and reached into his pocket, but Officer Pulver took a step back, unlatched his firearm, and said: "Don't reach for it!" *Id.* at 20. He ordered Calmes to take his hand out of his pocket, turn around, and place his hands behind his head with his fingers interlaced. At first, Calmes refused, and Officer Pulver, believing that Calmes was concealing something under his thumb, repeated the order. When Calmes complied, an "off-white, rock-like substance," later identified as cocaine, fell from Calmes's hand and rolled toward Officer Pulver. *Id.* at 22. Calmes was then placed under arrest.

The State charged Calmes with possession of cocaine as a class D felony,[1] possession of paraphernalia as a class D felony,[2] and being a habitual substance offender.[3] On October 19, 2007, Calmes filed a motion to suppress arguing that Officers Ealing and Pulver did not have reasonable suspicion to detain and question him and had therefore violated his rights secured by the Fourth Amendment to the United States Constitution.[4] After a hearing, the trial court granted the motion.

---

1. Ind.Code § 35–48–4–6 (Supp.2006).

2. Ind.Code § 35–48–4–8.3 (2004).

3. Ind.Code § 35–50–2–10 (Supp.2006).

4. In his motion to suppress, Calmes also argued that Officer Pulver's actions violated his rights secured by Article I, Section 11 of the

The issue on appeal was whether the trial court erred when it granted Calmes's motion to suppress. When appealing the trial court's granting of a motion to suppress, the State appeals from a negative judgment and must show that the ruling was contrary to law. *State v. Augustine*, 851 N.E.2d 1022, 1025 (Ind.Ct. App.2006). We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that reached by the trial court. *Id.* We neither reweigh the evidence nor judge the credibility of the witnesses, and we consider only the evidence most favorable to the judgment. *Id.* The State argued that Officer Pulver's "encounter with [Calmes] was consensual and at no time constituted a seizure of [Calmes] until the officer discovered [Calmes] was in possession of cocaine." Appellant's Brief at 5. Calmes, on the other hand, maintained that the encounter was investigatory in nature rather than consensual.

The Fourth Amendment to the United States Constitution guarantees the right to be secure against unreasonable search and seizure. *Augustine*, 851 N.E.2d at 1025. In order to determine whether the officer impinged upon Calmes's Fourth Amendment rights, we must first analyze what level of police investigation occurred. *See id.* There are three levels of police investigation, two of which implicate the Fourth Amendment and one of which does not. *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind.Ct.App. 2000), *reh'g denied, trans. denied.* First, the Fourth Amendment requires that an arrest or detention that lasts for more than a short period of time must be justified by probable cause. *Id.* Second, pursuant to Fourth Amendment jurisprudence, the police may, without a warrant

or probable cause, briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion that criminal activity has or is about to occur. *Id.* The third level of investigation occurs when a police officer makes a casual and brief inquiry of a citizen, which involves neither an arrest nor a stop. *Id.* This is a consensual encounter in which the Fourth Amendment is not implicated. *Id.*

As long as an individual remains free to leave, the encounter is consensual and there has been no violation of the individual's Fourth Amendment rights. *Shirley v. State*, 803 N.E.2d 251, 255 (Ind. Ct.App.2004). Factors to be considered in determining whether a reasonable person would believe he was not free to leave include: (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) the physical touching of the person, or (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.*

Relying in part on the Indiana Supreme Court's decision in *Finger v. State*, 799 N.E.2d 528 (Ind.2003), we held that a reasonable person in Calmes's position would not feel free to leave once the officer had taken the person's license. Op. at 204. Thus, the encounter at that point was no longer consensual, and the officers needed reasonable suspicion that criminal activity had or was about to occur to detain Calmes briefly for investigative purposes. *Id. Because the State maintained on appeal, as it had argued below, that the encounter was purely consensual,* we affirmed the trial court's grant of Calmes's motion to suppress. *Id.* Had the State framed and argued the issue differently,

Indiana Constitution. However, the parties did not raise this issue on appeal.

our analysis and outcome may have been different.

On rehearing, the State argues that our reliance on *Finger* was misplaced. In our decision, we summarized *Finger* as follows:

In *Finger*, a police officer, responding to a dispatch regarding a suspicious vehicle stopped at an intersection, activated his emergency lights and approached the vehicle, where he found the defendant sitting in the driver's seat and a passenger beside him. [799 N.E.2d] at 530. The defendant claimed that the car was out of fuel and that a passerby would be returning soon with more gasoline. *Id.* The officer noted that the defendant seemed nervous, though a stranded motorist should have been relieved to receive assistance. *Id.* at 531. As the officer conversed with the defendant, the explanation for his presence changed. *Id.* The officer then asked for and received the defendant's and the passenger's driver's licenses and ran warrant and license checks, which came back negative. *Id.* As the officer continued to converse with the defendant, he did not return the driver's licenses or say that they were free to leave. *Id.* When the officer asked about a knife on the back seat and ammunition in the front seat of the vehicle, both in plain view, the defendant claimed not to know why these items were in the car or to whom they belonged. *Id.*

Fifteen to twenty minutes after the officer first encountered them, he heard a radio report of an armed robbery at a liquor store less than one block from the car. *Id.* At this point, the officer asked the pair to exit the car and read them *Miranda* rights. *Id.* Next, based on safety concerns, he retrieved the ammunition and knife from the car. *Id.* In the meantime, police officers had been sent to the liquor store in response to the robbery call and learned that possible suspects were at the intersection where the officer had found the defendant's vehicle. *Id.* After a witness to the robbery identified the passenger in the defendant's car as one of the men in the store, the defendant and the passenger were placed under arrest. *Id.*

The defendant, charged with robbery, conspiracy to commit robbery, and criminal confinement, moved to suppress both the statements he made to the officer and the knife and ammunition seized from his car. *Id.* The trial court denied the motion, finding that the officer's initial approach to the defendant's vehicle and his interaction with the defendant did not constitute an investigative stop but that, after the officer learned of the robbery nearby, he had reasonable suspicion to detain the defendant. *Id.* The ruling was certified for interlocutory appeal, and this court reversed, concluding that the officer detained the defendant when he retained the defendant's driver's license and that, at that point, the officer did not have reasonable suspicion to execute a lawful investigative stop. *Id.* at 532.

The Indiana Supreme Court granted transfer and affirmed the decision of the trial court. *Id.* at 535. The Court held that "a reasonable person in [the defendant's] position would not feel free to leave after [the officer] retained his identification." *Id.* at 533. Thus, the defendant was "detained for purposes of the Fourth Amendment." *Id.* However, although it agreed that the officer's retention of the driver's license converted a consensual encounter into an investigative stop, the Court concluded that, at that point, "the officer had reasonable suspicion to detain defendant for a brief investigative period" and "therefore did

not violate the Fourth Amendment." *Id.*

Op. at 202–04.

The State argues that our reliance on *Finger* was misplaced because, in that case, the Indiana Supreme Court held that the investigative stop occurred when the officer *retained* the driver's license after he had finished the license check, rather than when the officer first took the license. *Finger,* according to the State, "clearly implies that the initial encounter up to the asking for, receiving, and using the driver's licenses to run identity and warrant checks did not render the encounter a detention. While those ordinary actions were occurring, the encounter was consensual." Petition for Reh'g at 4–5.

First, the State slightly mischaracterizes our decision, which did not hold that the officer briefly detained Calmes simply by walking off to the squad car with his license. Rather, we noted that, while the officer was running Calmes's license through the in car computer, the other officer asked him if he was armed. We concluded that a reasonable person in this position would not feel free to leave, which is the test used in *Finger. See* 799 N.E.2d at 532 ("Detention turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business."). Our decision was not meant to establish a rule as to how long the police may hold a license in determining someone's identity.

Moreover, although it is true the Court in *Finger* held that the investigative stop occurred when the officer did not return the license after finishing the license check, this holding must be understood within the factual context of the case. There, the defendant claimed to be a stranded motorist. Thus, when the officer parked behind him, activated his emergency lights, proceeded to ask a few questions, and then ran a license check, "these are all things a police officer would be expected to do upon finding a stranded motorist and do not indicate to a reasonable motorist that the officer intends to detain him." *Id.* at 533. In other words, the officer's actions "would not lead a reasonable person to feel that he was not free to leave." *Id.*

In the present case, however, Calmes was not a stranded motorist, and the reasoning in *Finger* concerning the reasonable expectations of stranded motorists does not apply to the present case. Accordingly, the State is correct that the facts in *Finger* are distinguishable.

However, the *Finger* Court relied on *United States v. Thompson,* 712 F.2d 1356 (11th Cir.1983), in reaching its conclusion, and that case is instructive. In *Thompson,* Jacksonville Port Authority Police Officer Kier approached Thompson, who was sitting in his car in an airport parking lot, to warn him about "a large parking charge." *Id.* at 1358. Officer Kier noticed that Thompson was holding a circular object to his nose and that, when Thompson first observed Officer Kier, he quickly moved the object to his side. *Id.* Officer Kier knocked on the window and asked for Thompson's identification, which Thompson handed to him. With the identification still in his hand, Officer Kier then asked Thompson for the object beside him, which Thompson produced. The object was a vial containing a powdery white substance. When Officer Kier asked whether the substance could be cocaine, Thompson replied, "Yes, it could." *Id.* at 1358. The officer then had Thompson exit the vehicle and placed him under arrest.

The crucial issue on appeal was "whether an investigative stop protected by the Fourth Amendment occurred before Kier asked Thompson to produce the vial," which the Eleventh Circuit also rephrased

as: "whether at the time Kier requested the vial the encounter was a voluntary encounter outside the purview of the Fourth Amendment or a protected *Terry*-type stop." *Id.* at 1359. Determining that the encounter was a protected *Terry* stop, the Eleventh Circuit reasoned:

> Fourth Amendment safeguards come into play where there is a "show of official authority such that 'a reasonable person would have believed he was not free to leave.'" [*Florida v.*] *Royer*, 460 U.S. [491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229] (quoting *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart & Rehnquist, JJ.)). Applying this test, we conclude that when Kier requested the vial a reasonable person in Thompson's position would have believed that he was not free to leave. The government argues that the mere request for and examination of airline tickets, identification, and the like does not convert a voluntary exchange into a protected *Terry*-type stop. *But Kier did more than simply request and examine Thompson's driver's license.* The record shows, and the government at oral argument acknowledged, that *when Kier made the request he had not returned Thompson's driver's license.* Indeed, it is fair to infer that Kier kept Thompson's license throughout the incident. *When Kier retained Thompson's license, the encounter matured into an investigative stop protected by the Fourth Amendment.* Without his driver's license Thompson was effectively immobilized. A reasonable person in these circumstances would not have believed himself free to leave. If Thompson had tried to drive away he could have been arrested for driving without a license.

*Id.* (emphasis added and footnote omitted). Because Officer Kier did not have a rea-sonable suspicion of criminal activity until after he opened the vial, the Eleventh Circuit held that the search of the vial was unlawful. *Id.* at 1361.

■ As in *Thompson,* the officers in the present case did not simply request and examine Calmes's identification. Rather, one officer took it to the squad car, while the other proceeded to ask Calmes if he was armed. "In determining whether a contact between a citizen and a police officer is a 'stop' that implicates the *Terry* protections, the crucial consideration is whether the citizen was under a reasonable impression that he was not free to leave the officer's presence." *Crabtree v. State,* 762 N.E.2d 241, 245 (Ind.Ct.App. 2002) (citing *United States v. Wylie,* 569 F.2d 62, 68 (D.C.Cir.1977)). The test for whether such a reasonable impression existed is what a reasonable person, innocent of any crime, would have thought had he been in the citizen's shoes. *Id.*

■ Although nothing in the record suggests that Calmes was a motorist and needed his license to leave the location, nonetheless, upon being asked if he was armed, a reasonable person in Calmes's position would not feel free simply to terminate the encounter, leave his license with the police, and walk away. *See, e.g., United States v. Crump,* 62 F.Supp.2d 560, 564 (D.Conn.1999) (holding that the encounter between an officer and the defendant did not rise to the level of a *Terry* stop until the defendant gave the officer his license and the officer informed the defendant that he was going to be given a "pat-down"); *see also Dowdell v. State,* 747 N.E.2d 564, 567 (Ind.Ct.App.2001) ("A reasonable person when faced with a police officer pulling up to him in a marked vehicle and calling for him to come over to the car would not assume that he can just turn and walk away."), *trans. denied.*

We grant rehearing and clarify and affirm our original opinion as set forth herein.

DARDEN, J., and NAJAM, J., concur.