# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GARY R. ROM**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**BROOKE N. RUSSELL**
Indianapolis, Indiana



FILED

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 36A04-1108-CR-419 |
| | ) | |
| MERSHAUN SCOTT, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE JACKSON CIRCUIT COURT
The Honorable William E. Vance, Judge
Cause No. 36C01-1005-FC-28

**March 1, 2012**

**OPINION – FOR PUBLICATION**

**BAKER, Judge**

Appellant-plaintiff State of Indiana (State) appeals the trial court's grant of appellee-defendant Mershaun W. Scott's motion to suppress. The State argues that the police officer at the scene had the requisite reasonable suspicion to approach Scott and later arrest him after smelling burnt marijuana in the vehicle. As a result, the State maintains that none of the the police officer's actions violated Scott's rights under either the Fourth Amendment to the United States Constitution (Fourth Amendment) or Article 1, Section 11 of the Indiana Constitution.

We concur with the trial court's conclusion that the police officer violated Scott's right to be free from unreasonable search and seizure under the Fourth Amendment when the police officer detained Scott and retained Scott's driver's license for an unreasonable period of time without any reasonable suspicion that Scott had committed a criminal offense. The record also supports the conclusion that Scott was seized and was not free to leave during the encounter with the police officer. Thus, we affirm the trial court's grant of Scott's motion to suppress.

### FACTS

On April 27, 2010, at approximately 9:00 a.m., Indiana State Trooper Randell Miller was parked in a median near mile marker 54 on Interstate 65 (I-65) observing southbound traffic. At some point, Trooper Miller clocked the driver of a BMW with a Tennessee license plate at fifty-six miles per hour in a seventy-mile-per-hour zone.

2

As the BMW approached, Trooper Miller observed the driver, who was later identified as Scott, a black male, slow the vehicle to fifty miles per hour. Trooper Miller also thought that Scott was trying to "hide behind the pillar of the vehicle." Appellant's App. p. 16. Trooper Miller began following Scott and saw him drive to a McDonald's Restaurant. Trooper Miller waited at a nearby Circle K gas station and watched Scott proceed to the McDonald's drive-thru window.

Scott then drove to the Circle K to eat his food and purchase some cigarettes and gasoline. When Scott returned to his vehicle, he telephoned his grandfather. At some point, Scott began pumping gas and Trooper Miller approached him. Trooper Miller had been watching Scott for nearly fifteen minutes before walking up to him.

Trooper Miller asked Scott if "everything was ok," because he had seen him driving fifty miles per hour on I-65. Appellant's App. p. 16. Trooper Miller also asked Scott if he had been wearing his seatbelt. Scott responded that his tires were bald and was trying to be careful. Ex. 1; Ex. 2. Trooper Miller then asked Scott what he did for a living and inquired as to whether he had a "good license." Ex. 2. At Trooper Miller's request, Scott handed him his Illinois driver's license. While holding the license, Trooper Miller asked Scott more questions and told him that he would be "good to go," if his license "checked out normally." Ex. 2. However, prior to performing a computer check on his license, Trooper Miller continued to question Scott about the year of his vehicle, the cost of it, and asked what he did for a living.

3

Scott eventually opened the door to his vehicle and retrieved his registration. At some point, Trooper Miller smelled the odor of burnt marijuana. Trooper Miller then asked Scott to accompany him to his squad car. Once inside, Trooper Miller read Scott his Miranda rights. Scott told Trooper Miller that his brother had borrowed the vehicle and claimed that there was no marijuana inside. Trooper Miller then called for a canine unit after Scott refused consent to a search his vehicle. Trooper Miller also noticed that Scott had a "green-filmy" tongue that commonly occurs when a person smokes marijuana. The canine alerted to the presence of drugs after performing a "sweep" of the vehicle. The officers subsequently discovered a small quantity of marijuana inside the vehicle. Ex. 1, p. 15, 19.

Scott then told the officers that there was a handgun inside the trunk of the vehicle. A portion of the serial number was obliterated, and Scott claimed that he purchased the weapon at a gun show, and that he had wrapped tape on the gun to keep a loose screw in place. Scott also admitted to the police officers that he was on his way to deliver the marijuana to his girlfriend in Tennessee.

On May 18, 2010, the State charged Scott with possession of an altered handgun, a class C felony, and possession of marijuana, a class A misdemeanor. Thereafter, on March 8, 2011, Scott filed a motion to suppress all evidence that was seized from the vehicle and the statements that Scott had made to the police officers. Scott argued that he did not commit any illegal behavior and, therefore, Trooper Miller did not have grounds to stop him. Thus, Scott claimed that the warrantless stop and subsequent search could

4

not be justified as a valid exception to the Fourth Amendment's search warrant requirement. Scott also claimed that the search was illegal under Article 1, Section 11 of the Indiana Constitution. Following a hearing on July 20, 2011, the trial court granted Scott's motion to suppress. The State now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

We review a trial court's decision to grant a motion to suppress similar to other sufficiency of the evidence matters. State v. Lucas, 859 N.E.2d 1244, 1248 (Ind. Ct. App. 2007). When conducting such a review, we will not reweigh evidence or judge witness credibility. State v. Moriarity, 832 N.E.2d 555, 558 (Ind. Ct. App. 2005). In such cases, the State is appealing from a negative judgment and must show that the trial court's ruling on the motion to suppress was contrary to law. State v. Estep, 753 N.E.2d 22, 24–25 (Ind. Ct. App. 2001). We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. Id. at 25.

### II. The State's Contentions

The State contends that the trial court erred in granting Scott's motion to suppress because the encounter between Scott and Trooper Miller was consensual. Thus, the Fourth Amendment was not implicated and no seizure occurred until after Trooper Miller smelled the marijuana, which amounted to probable cause to arrest Scott. As a result, the

5

State argues that Trooper Miller did not violate Scott's right to be free from unreasonable search and seizure.

The Fourth Amendment to the United States Constitution protects the privacy and possessory interests of individuals by prohibiting unreasonable searches and seizures. Berry v. State, 704 N.E.2d 462, 464 (Ind. 1998). Fourth Amendment protections apply when a person has an actual subjective expectation of privacy and the expectation is one that society is prepared to recognize as reasonable. Alexander v. State, 947 N.E.2d 966, 967 (Ind. Ct. App. 2011).

In general, an officer's approach and questioning of an individual that does not involve a detention in a public place is outside the purview of the Fourth Amendment. However, the Fourth Amendment is triggered when there is a show of authority such that a reasonable person would have believed he was not free to leave. United States v. Mendenhall, 446 U.S. 544, 554 (1980). In other words, the Fourth Amendment is not implicated unless the encounter "loses its consensual nature." Florida v. Bostick, 501 U.S. 429, 434 (1991). And a seizure does not occur "simply because a police officer approaches an individual and asks a few questions," so long as "a reasonable person would feel free to disregard the police and go about his business." Id. at 434. However, a full-blown arrest or a detention that lasts for more than a short period of time must be justified by probable cause. Finger v. State, 799 N.E.2d 528, 532 (Ind. 2003).

A consensual encounter occurs when a police officer makes a casual and brief inquiry of a citizen, which involves neither an arrest nor a stop. Overstreet v. State, 724

N.E.2d 661, 663 (Ind. Ct. App. 2000). As long as the individual remains free to leave, under all the circumstances, the encounter is consensual and there has been no violation of the individual's Fourth Amendment rights. Shirley v. State, 803 N.E.2d 251, 255 (Ind. Ct. App. 2004).

The test for whether such a reasonable impression existed is what a reasonable person, innocent of any crime, would have thought had he been in the citizen's shoes. State v. Calmes, 894 N.E.2d 199, 205 (Ind. Ct. App. 2008). The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Michigan v. Chestnut, 486 U.S. 567, 573 (1988).

Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a seizure under the Fourth Amendment. Florida v. Royer, 460 U.S. 491, 501 (1983). However, several courts have determined that a consensual encounter between a police officer becomes a detention when the officer retains the defendant's license longer than what would be reasonably necessary to review the license or the officer makes further investigative inquiries while possessing the license, thus indicating that compliance with the police officer's request might be compelled. See United States v. Lambert, 46 F.3d 1064 (10th Cir. 1995) (observing that a police officer's undue retention of an individual's driver's license during a traffic stop renders the encounter nonconsensual); United States v. Thompson, 712 F.2d 1356 (11th Cir. 1983) (police officer's retention of the defendant's driver's license rendered a consensual

7

encounter an investigative stop because the defendant was effectively immobilized without his license); U.S. v. Guerrero, 472 F.3d 784 (10th Cir. 2007) (observing that a police officer's taking possession of the defendant's driver's license changed the encounter to an investigative detention).

To further illustrate, in Finger, our Supreme Court held that when a police officer retains an individual's driver's license, that person is considered detained for purposes of the Fourth Amendment. The evidence in Finger demonstrated that a police officer parked behind the defendant's vehicle, activated his emergency lights, and proceeded to ask a few questions, including whether Finger needed assistance. These are factors that when "taken together, would not lead a reasonable person to feel that he was not free to leave." Finger, 799 N.E.2d at 533. Rather, the consensual encounter "evolved into an investigative stop" when the police officer did not return the driver's identification to him after completing the license check. And instead of returning the license, the police officer continued conversing with Finger and asking incriminating questions. Id. Thus, Finger was detained for purposes of the Fourth Amendment. See also Calmes, 894 N.E.2d at 205 (observing that an individual in the defendant's position would not feel free to leave when one police officer obtained the defendant's driver's license to run a computer check, while another officer continued to question the defendant).

Notwithstanding the determination that the police officer's act of retaining the defendant's driver's license amounted to a detention and seizure in Finger, it was also observed that at the time of the detention, the police officer relied on the following facts:

8

(1) Finger's car was reported as . . . "suspicious"; (2) although Finger claimed the car was out of fuel, and someone had gone for gasoline, a gas station was around the corner and the fuel gauge indicated that there was one eighth of a tank of fuel remaining in the car; (3) Finger told other inconsistent stories during his conversation with [the police officer]; (4) there was a folded pocketknife in the car; and (5) Finger and his passenger were "acting nervous."

Id. at 534. The officer also had received a report that a robbery had been committed approximately one block from the stop. Thus, it was ultimately determined that these factors rendered the detention reasonable and, therefore, the trial court properly denied Finger's motion to suppress. Id. at 535.

In this case, Trooper Miller did not observe Scott commit a criminal offense and Scott was not issued a ticket for any traffic violation. Rather, Trooper Miller decided to follow Scott after he saw him exit on to US 50. Ex. 1, p. 8-9. Although it is not clear precisely how long Trooper Miller waited at the Circle K gas station, it was at least thirteen minutes before he approached Scott. Ex. 2.

During the initial conversation, Trooper Miller articulated some driving behaviors to Scott that he thought were suspicious. And before asking Scott for his driver's license, Trooper Miller suggested that Scott had engaged in illegal behavior. Once Trooper Miller, who was standing between Scott and his vehicle, indicated that he had been following Scott, we cannot say that Scott would have believed that he was free to leave.

Moreover, even assuming that the encounter may have been consensual when Trooper Miller initially approached and talked to Scott, it is readily apparent that Scott was not free to leave when Miller asked for—and retained—Scott's driver's license.

9

Finger, 799 N.E.2d at 533. Trooper Miller retained Scott's driver's license while asking him questions. And while holding the license, Miller continued to question Scott and ask him about the year of his vehicle as he walked around the car. Ex. 1, p. 11-12. And, while Trooper Miller told Scott that he would be "good to go" after he performed a computer verification of his license, Trooper Miller did not check Scott's license until well after the encounter had commenced.

We also note that Scott did not reside in Indiana, had no friends or family in the area, and had never before stopped in Jackson County. Tr. p. 5-6. In short, there was no one that Scott could contact to pick him up and he was totally reliant on his vehicle. Scott needed his driver's license to continue the trip; otherwise, he would be in violation of Indiana law.[1]

Although the State seems to suggest that Trooper Miller could examine and retain Scott's license for an indefinite period to complete his task of performing the computer check, Finger does not permit such conduct. Moreover, Trooper Miller had no reason to believe that Scott was not forthcoming with him about the status of his license. At the point that Trooper Miller asked Scott for his license, Scott had been completely cooperative with Miller. Moreover, Trooper Miller could have performed a check on his license plate that was plainly visible to determine whether the registered owner of the

---

[1] Ind. Code § 9-24-13-3 provides that "an individual holding a permit or license issued under this article must have the permit or license in the individual's immediate possession when driving or operating a motor vehicle. The permittee or licensee shall display the license or permit upon demand of a court or a police officer authorized by law to enforce motor vehicle rules."

10

vehicle had a validly issued driver's license. However, Trooper Miller chose not to run the license plate during the numerous miles that he followed Scott.

Trooper Miller retained Scott's license much longer than what it would take to examine the license and perform a computer verification. And, as discussed above, even if Scott wanted to terminate the encounter because he had already answered Trooper Miller's questions, he could not do so while Trooper Miller retained his license.

We reject the State's contention that Trooper Miller was merely engaging Scott in conversation that Scott could terminate at any point and leave the scene. In our view, this case is markedly different from the typical civilian encounter where an individual would feel free to leave. Indeed, Trooper Miller, who was armed and in full uniform, took the conversation beyond a seemingly consensual encounter by immediately admitting to following Scott for a number of miles, stopping him, pointing out problems with Scott's driving behavior, asking about illegal behavior, and asking for Scott's driver's license and retaining it for no apparent reason. Ex. 2. All of these circumstances suggest that Scott was obligated to remain at the scene and answer Trooper Miller's questions.

As in Finger, the seemingly initial consensual encounter between Trooper Miller and Scott became a detention and seizure in violation of the Fourth Amendment when Trooper Miller retained Scott's driver's license. As a result, Scott's act of opening his car door to obtain his registration was not voluntary. Rather, that act was in apparent response to Trooper Miller's retention of the driver's license and continuing

11

interrogation.   As a result, we conclude that the trial court did not err in granting Scott's

motion to suppress.[2]

The judgment of the trial court is affirmed.

DARDEN, J., and BAILEY, J., concur.

---

[2] Because we have concluded that Scott's rights were violated under the Fourth Amendment, we need not address Scott's alternative contention that Trooper Miller's actions also violated Scott's right to be free from unreasonable search and seizure under Article 1, Section 11 of the Indiana Constitution.