**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 08 2012, 9:46 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRIAN E. GRAVES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 16A01-1205-CR-227 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DECATUR CIRCUIT COURT
The Honorable John Westhafer, Judge
Cause No. 16C01-1105-FB-291

**November 8, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Brian E. Graves appeals his conviction of Escape,[1] a class B felony, claiming the evidence did not establish that he was under lawful detention when he attempted to leave the scene while a law enforcement officer investigated the status of his driver's license.

We affirm.

The facts favorable to the conviction are that late on the cold and snowy evening of February 7, 2010 Indiana State Police Trooper Christopher Howell began to patrol Interstate 74 looking for drivers who might be stranded due to the inclement weather. The trooper observed Graves's truck parked in the emergency pull-off lane on the interstate. Graves was standing at the front of the vehicle. When Trooper Howell stopped to investigate, he asked Graves what he was doing. Graves replied that he was scraping ice from his windshield. Trooper Howell, who observed that there was nothing in Graves's hands, noted that Graves's words were slurred and he was unsteady on his feet. At this point, Howell was standing in front of his police cruiser, which in turn was stopped behind Graves's truck. He asked Graves to come to him. Graves initially refused and told the trooper he was going to "take off". *Transcript* at 34. In response, Trooper Howell issued a "loud command" to Graves to walk to the trooper. *Id*. This time, Graves complied. The trooper patted down Graves and asked where he had been and where he was going. When Graves responded, Trooper Howell detected the odor of alcohol on his breath. He asked if Graves had been drinking and Graves said he had not. Trooper Howell asked for Graves's identification and registration

---

[1]  Ind. Code Ann. § 35-44-3-5(a), *recodified at* Ind. Code Ann. § 35-44.1-3-4 (West, Westlaw current with all 2012 legislation).

and was informed that they were in the truck. He escorted Graves to the vehicle and watched as Graves retrieved his wallet and began looking through its contents. He noted that Graves had an Indiana identification card, which signified to the trooper either that Graves did not have a driver's license, or that his license was suspended. He asked Graves about the status of his license and Graves responded that it had been suspended for nonpayment of parking tickets. Graves was not able to produce any of the other requested documentation. At that point, because of the weather and conditions, Trooper Howell asked Graves to sit in the front passenger seat of his police cruiser while he verified Graves's information.

After the two were seated inside the cruiser, Trooper Howell began running Graves's information on a laptop computer located between the two of them such that both Howell and Graves could see the information displayed on the screen. When the laptop began to emit audible alert tones and display Graves's information, Graves was looking at the screen and reading the information along with Trooper Howell. Among the information on the screen was an indication that Graves was wanted on four open warrants. After a few seconds, Graves "turned his head and said sorry, I gotta go." *Id*. at 39. He then opened the door and, according to Howell, "out he went." *Id*. Trooper Howell at first just sat there, "dumbfounded." *Id*. at 40. He saw Graves start toward his truck, and then the trooper exited his car and ran to intercept Graves. During the ensuing scuffle, the trooper repeatedly commanded Graves to "stop resisting" and told him, "You need to stop." *Id*. at 74. He grabbed Graves while they were between the vehicles, but Graves slipped from his grasp and continued to the front passenger side of his truck. Trooper Howell decided to run around the driver's side of the truck and intercept Graves from that direction. He caught Graves near the

3

front of the vehicle. Graves pushed Howell, who fell backward and hit his head and was stunned for a moment. By the time Howell recovered, Graves had climbed into the driver's seat of the truck, but the door was still open when Howell got to him and began pulling on Graves, attempting to extricate him from the truck. He continued pulling Graves by the coat and ordering him to get out of the truck and to quit resisting. At some point, Graves managed to get his truck into gear, stepped on the gas, and began driving away. When he did, the forward motion caused the door to shut on Trooper Howell's left hand, injuring one of his fingers badly enough that it later required stitches. Trooper Howell hung on "for a little bit" but soon let go. *Id*. at 42. He called the State Police Post and gave them Graves's description and a description of his truck. That description was relayed to law enforcement officials in the area.

Approximately ten minutes later, Deputy Joseph Mohr of the Shelby County Sheriff's Department observed Graves driving on I-74. After ascertaining that the truck matched the description of the subject vehicle, Deputy Mohr initiated a traffic stop. Graves sped away and threw several items out of the window before he eventually stopped after a chase. He was ultimately convicted of escape as a class B felony, resisting law enforcement as a class D felony, [2] and found to be a habitual offender.

Graves contends the evidence did not establish that he was under lawful detention at the time he left the scene of the stop. Our standard of reviewing challenges to the sufficiency of the evidence supporting a criminal conviction is well settled.

When reviewing a claim that the evidence introduced at trial was insufficient

---

[2] This count was "merged" with the escape count at sentencing. *Appellant's Appendix* at 136.

to support a conviction, we consider only the probative evidence and reasonable inferences that support the trial court's finding of guilt. We likewise consider conflicting evidence in the light most favorable to the trial court's finding. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. Instead, we will affirm the conviction unless no reasonable trier of fact could have found the elements of the crime beyond a reasonable doubt.

*Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). When considering a challenge to the evidence, we neither reweigh the evidence nor assess the credibility of witnesses. *Turner v. State*, 953 N.E.2d 1039 (Ind. 2011).

In order to convict Graves of escape, the State was required to establish the elements set out in the former I.C. § 35-44-3-5(a), now recodified at I.C. § 35-44.1-3-4 (the Escape Statute), which include the following: (1) Intentionally (2) fleeing (3) from lawful detention, and while doing so, (4) inflicting bodily injury on another. Graves challenges the evidence only with respect to the element of "lawful detention". In addressing his challenge, we are called upon to interpret the meaning of the Escape Statute.

The interpretation of a statute is a question of law reserved for the courts. *Scalpelli v. State*, 827 N.E.2d 1193 (Ind. Ct. App. 2005), *trans. denied.* We review such questions under a de novo standard and give no deference to a trial court's legal conclusions. *Id.* "A statute whose language is clear and unambiguous is not subject to judicial interpretation." *Id.* at 1196 (quoting *Romine v. Gagle,* 782 N.E.2d 369, 379 (Ind. Ct. App. 2003), *trans. denied*). On the other hand, if the statute is ambiguous, we must determine the legislative intent and interpret the statute accordingly. *Scalpelli v. State*, 827 N.E.2d 1193. We determine legislative intent by examining the plain language of the statute and attribute the common, ordinary meaning to terms found in everyday speech. *Id.*

Ind. Code Ann. § 35-31.5-2-186 (West, Westlaw current with all 2012 legislation) provides a list of examples of "lawful detention", within the meaning of the Escape Statute, including a catch-all provision for "any other detention for law enforcement purposes." *See* I.C. § 35-31.5-2-186(a)(10). In the present case, Trooper Howell came upon Graves while Graves was standing near his vehicle beside the road. Howell was in his uniform and driving a marked police vehicle with its emergency lights activated. Howell noticed what appeared to be signs of intoxication and asked Graves to come to the rear of his vehicle. When Graves failed to comply, Howell raised his voice and issued what he characterized as a "command" to Graves that he walk to the rear of the vehicle. *Transcript* at 34. Graves was unable to produce a driver's license or registration upon request, which prompted the need for further investigation on Howell's part. Howell then asked Graves to sit in his squad car while he ran a search of Graves's name. There is no question that up to that point, in conjunction with his investigation to determine whether Graves was intoxicated, and then to discover the status of his driver's license and the vehicle's registration, Trooper Howell had briefly and justifiably restricted Graves's movements for law enforcement purposes. *See Terry v. Ohio*, 392 U.S. 1 (1968) (it is well settled that under the Fourth Amendment, police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has a reasonable suspicion that criminal activity may be afoot).

We think it clear that as he sat in Trooper Howell's police cruiser, Graves was in fact "detained" for purposes of the Escape Statute. That is, he was not free to leave. Any doubt that lingers on that question, and we have none, is removed by considering Howell's reaction

6

when Graves attempted to leave the scene. Graves's exit from the cruiser engendered a near immediate and forceful response from Howell, including repeated commands to stop and the use of physical force. Graves responded in kind by resisting Howell's attempts to subdue him. We reiterate our conclusion that at this point, Graves was detained.

Graves correctly contends, however, that in order to obtain a conviction for escape, it was incumbent upon the State to prove that Graves *knew* he was detained. Graves further contends that the evidence indicates he did not know: "Graves was never restrained or ordered to stay in the police car. He was not Mirandized. His freedom of movement was in no way hampered. Nor was the officer in the process of arresting him." *Reply Brief of Appellant* at 3. Graves's argument relies primarily upon the lack of physical restraints, e.g., that he was not handcuffed, and upon the fact that Howell did not formally place him under arrest or explicitly state that Graves was not free to leave.

*Terry* permits police officers to briefly detain persons for investigatory stops. There is no requirement under *Terry* that a person so stopped must be formally placed under arrest during the stop. Indeed, the power to impose pre-arrest detention recognized by *Terry* would be eviscerated by the interpretation of the Escape Statute that Graves urges. "Detention turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business." *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003). The flip-side of this is that "[i]f a person's freedom to leave is restricted by something other than police authority, it cannot be said that the police detained the person." *Id.* The question, then, is whether a reasonable person in Graves's circumstances would have felt free to leave.

7

Graves was found standing alone by his truck on the side of an interstate highway. A uniformed trooper pulled behind Graves's truck, activated his emergency lights, and walked to the back of Graves's vehicle. Graves's initial refusal to join Howell at the back of his truck was met by a forceful command from the officer to move to that location. The trooper twice asked Graves whether he had been drinking. The first time, Graves denied consuming alcohol. When asked again several minutes later, however, Graves admitted that he "had had a couple beers." *Transcript* at 38. Graves was unable to comply with the trooper's request to provide a valid driver's license and vehicle registration. In fact, Graves admitted that his license was currently suspended. Howell then asked Graves to sit in his cruiser "so [he] could verify his information." *Id*. at 37. A reasonable person in those circumstances would have known that the failure to provide a valid driver's license and vehicle registration to a uniformed law enforcement official upon request would result in his being required to stay at the scene at least long enough to resolve the issue of his license status. This is especially so when the officer tells the person that he wants to verify his information.

According to Howell, Graves could see the computer screen that Howell used to search the status of Graves's license and any outstanding warrants. Howell testified that Graves was looking at it when it began to display information indicating that Graves had outstanding warrants and that his license was suspended. Graves testified that he could not see the screen at that moment, but the jury was not required to credit that testimony. The evidence shows that at that moment he saw the damning information, Graves announced that he was leaving, and he got out of the car. A reasonable person in those circumstances would have known that he was not at that moment free to follow the dictates of his unfettered will.

A reasonable person would certainly have known this from Trooper Howell's near immediate response, i.e., he began chasing Graves, ordered him to stop, and physically attempted to prevent him from leaving the scene. In short, the facts and reasonable inferences support the determination that a reasonable person in Graves's circumstances would not have felt free to leave, and therefore that he was under lawful detention when he fled the scene. This, in turn, was sufficient to establish the elements of the Escape Statute.

Judgment affirmed.

BROWN, J., and PYLE, J., concur.