Mark WELLS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0907–CR–646.

Court of Appeals of Indiana.

March 10, 2010.

Transfer Denied May 20, 2010.

D. Alan Ladd, Ladd, Thomas, Sallee, & Adams, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, James E. Porter, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Mark Wells appeals the denial of his motion to suppress. We reverse.

### Issue

The sole restated issue is whether the trial court properly refused to suppress evidence police found during a search of Wells's vehicle.

### Facts

On December 16, 2008, Indianapolis Metropolitan Police Officers Theodore Brink and Jarrod Gray[1] were on patrol. As they were driving on Keystone Avenue and approached an interchange with I–65,

---

1. Officer Gray was a new, probationary officer at this time, and Officer Brink was his field training supervisor. Officer Gray has since left the force.

they saw Wells driving a pickup truck down the exit ramp "at a high rate of speed." Tr. p. 56. The officers at first did not think the vehicle was going to stop, and Officer Gray applied his brakes heavily, thinking the vehicle was going to collide with their police car. The vehicle, however, stopped at the end of the exit ramp before going onto Keystone Avenue. As the officers drove by, they also noticed a crack in the vehicle's windshield. They decided to initiate a traffic stop of the vehicle because of the windshield and the high rate of speed on the exit ramp.

The stop commenced at 11:45 a.m. As the officers approached the vehicle, they noticed that Wells appeared very nervous and fidgety. Officer Brink believed, based on his experience, that the level of nervousness and fidgeting Wells was displaying was "consistent with" methamphetamine use. *Id.* at 63. Wells gave Officer Gray his driver's license but explained he did not yet have a registration for the vehicle because he had recently purchased it. Officer Gray asked Wells if he had any weapons or narcotics in the vehicle, and he replied no.

While walking back to the police car with Wells's license, Officer Gray noticed that Wells was continuing to move about and fidget in the inside of his vehicle, and he ordered Wells to keep his hands on the steering wheel. However, while entering Wells's license and plate information into the computer at 11:47 a.m., Officer Gray saw Wells lean down entirely onto the passenger side of the vehicle. He then went back to the vehicle, asked Wells to step out, and performed a pat-down frisk of Wells, which uncovered no contraband. When Officer Gray asked him again if Wells had anything in the vehicle he need-

ed to know about, Wells now said there was a shotgun behind the front seat. Officer Brink asked if he could remove the shotgun, but Wells refused permission to do so. The officers then had Wells sit at a nearby gas station and did not allow him back into the vehicle, but they did not handcuff him.

At 12:01 p.m., Officer Gray entered the vehicle's VIN into the computer to verify it was not reported stolen, and it was not. Also, by this time the officers had verified that Wells was not wanted on any warrants. At 12:04 p.m., Officer Brink directed Officer Gray to call for a K–9 unit as "backup." [2] Tr. p. 24. Officer Paul Spall responded at 12:08 p.m. that he was on his way to the scene, and he arrived fifteen minutes thereafter. Officer Spall's drug dog then sniffed Wells's vehicle and alerted to it. Officer Brink searched the vehicle and found methamphetamine and the shotgun in it. The officers then arrested Wells and called for a wrecker to tow his vehicle at 12:45 p.m. At 1:00 p.m., Officer Gray wrote a traffic ticket to Wells for the cracked windshield.

On December 19, 2008, the State charged Wells with Class C felony possession of methamphetamine and Class C felony possession of methamphetamine and a firearm. Wells moved to suppress the evidence found in his vehicle, and the trial court held a hearing on the motion on May 12, 2009. The trial court denied the motion. Wells petitioned for and we have agreed to entertain an interlocutory appeal from this denial.

### Analysis

We review the denial of a motion to suppress in a manner similar to other sufficiency matters, in that we must deter-

---

**2.** Although at various points during the suppression hearing both Officers Gray and Brink generically referred to calling for "backup," Officer Brink clarified that he specifically requested the assistance of a K–9 unit.

mine whether substantial evidence of probative value supports the trial court's ruling. *Faris v. State*, 901 N.E.2d 1123, 1126 (Ind.Ct.App.2009), *trans. denied.* "We do not reweigh the evidence and will consider any conflicting evidence in a light most favorable to the trial court's ruling." *Id.* However, unlike a typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we also consider any uncontested evidence favorable to the defendant. *Id.* We will affirm a denial of a motion to suppress if it is sustainable on any legal grounds apparent in the record. *Id.*

Wells contends both that the initial stop of his vehicle and the later search of it were invalid. We conclude that even assuming the initial stop was valid, the search was not. We focus our analysis solely on the search.

 A seizure that is lawful at its inception may violate the Fourth Amendment "if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005).[3] "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* Where a car is searched and contraband is discovered after a dog sniff of the vehicle, discovery of the contraband may be the product of an unconstitutional seizure if the sniff occurred during an unreasonably prolonged traffic stop. *See id.* Although a dog sniff is not a search, an officer must have reasonable suspicion of criminal activity in order to detain an individual beyond what is necessary to complete a traffic stop related to the reason

for that stop. *See Wilson v. State*, 847 N.E.2d 1064, 1067 (Ind.Ct.App.2006). "The burden is on the State to show the time for the traffic stop was not increased due to the canine sweep." *Id.*

Here, there does not appear to be any serious dispute that the length of Wells's traffic stop was substantially lengthened by the call for the K-9 and subsequent dog sniff. Officer Gray admitted as much in his testimony. *See* Tr. p. 31. Shortly after noon, Officer Gray had received the necessary information regarding Wells's license, the lack of any warrants for him, and apparently confirmed that the vehicle was not stolen, which was consistent with Wells's explanation that he had recently purchased it. At that point, it should have been a relatively quick and easy matter to write a ticket to Wells. Instead, at Officer Brink's direction, Officer Gray called for the K-9 *after* obtaining all of the necessary information. Based on the record, it appears Officer Spall arrived with his dog at approximately 12:23 p.m., or nearly twenty minutes after Wells's traffic stop could have been completed and almost forty minutes after it began.

 Thus, we must determine whether the officers possessed reasonable suspicion that Wells was engaged in criminal activity so as to justify detaining him far beyond the time in which the traffic stop could have been completed. When reviewing a determination of reasonable suspicion, we must defer to the trial court's findings of historical fact, but we consider de novo whether those facts could constitute reasonable suspicion. *See Thayer v. State*, 904 N.E.2d 706, 709 (Ind. Ct.App.2009). Reasonable suspicion is less demanding than probable cause and re-

**3.** Although Wells mentions the Indiana Constitution in his brief, he fails to develop an independent analysis regarding that docu-

ment. Thus, we will focus exclusively upon the United States Constitution.

quires a showing considerably less than a preponderance of the evidence, but still requires a minimal level of objective justification and more than an inchoate and unparticularized suspicion or hunch of criminal activity. *Teague v. State,* 891 N.E.2d 1121, 1127 (Ind.Ct.App.2008). When reviewing a determination of reasonable suspicion, a court examines the totality of the circumstances to see whether an officer had a particularized and objective basis for suspecting legal wrongdoing. *Id.* "The reasonable suspicion requirement is satisfied when the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur." *Id.*

The State's primary basis for arguing that the officers had reasonable suspicion to detain Wells for an extended period of time while waiting for the K–9 unit was Wells's extreme nervousness and fidgetiness. Our supreme court has noted, "Because it is not at all unusual that a citizen may become nervous when confronted by law enforcement officials, other evidence that a person may be engaged in criminal activity must accompany nervousness before the nervousness will evoke suspicion necessary to support detention." *State v. Quirk,* 842 N.E.2d 334, 341 (Ind.2006). The State contends that Wells's behavior went beyond mere nervousness and was indicative of methamphetamine use on his part, thus providing reasonable suspicion justifying the call to the K–9 unit.

Officer Brink did testify that he has experience observing people under the influence of methamphetamine. He listed a number of behaviors such persons demonstrate, including fidgetiness, licking of the lips, touching and rubbing of the face, scabs and the picking of scabs, scratching and scratch marks on the arms, having a sour body odor, poor hygiene, bad breath, and bad teeth. Of these characteristics, however, Officer Brink only noted Wells's extreme fidgetiness, which he described as "consistent with" methamphetamine use. Tr. p. 63. None of the other characteristics were noted. We cannot conclude that this observation by itself supports a finding of reasonable suspicion.

In addition, Wells refused to stay seated upright and keep his hands on the steering wheel as ordered by the officers while they ran his information. We have no qualms in saying that Wells's furtive movements, in addition to his nervousness, created legitimate officer safety concerns that justified Wells's removal from the vehicle for a pat-down search and further questioning about whether he possessed any weapons. Wells then gave an answer regarding weapons that contradicted his first answer, admitting that there was a gun in the vehicle. Again, we have no qualms with the officers then deciding that Wells would not be permitted to re-enter his vehicle while the traffic stop was proceeding.

However, once these legitimate officer safety concerns were alleviated by the pat-down search of Wells and keeping him out of the vehicle while the stop was completed, we conclude there was a lack of reasonable suspicion of criminal activity to keep Wells further waiting for the arrival of the K–9 unit. *See Crabtree v. State,* 762 N.E.2d 241, 249 (Ind.Ct.App.2002) (holding that officer safety concerns cannot, standing alone, "form the basis for an objectively reasonable suspicion of criminal activity"). Officer Brink testified that he advised Officer Gray to call for backup for safety reasons; i.e., a backup officer would observe Wells closely while Officer Gray finished writing a ticket. He also testified, however, that he specifically requested the assistance of a K–9 unit, rather than any nearby officer. There is no

indication of how long the nearest available officer would have taken to arrive on the scene. Officer Brink also testified that if a non–K–9 backup officer had arrived, there would have been no search of Wells's vehicle and he would have been permitted to drive away after the ticket was written.[4]

Additionally, Officer Brink himself was on the scene and could, theoretically, have acted as backup to watch Wells while Officer Gray wrote a ticket. He testified that as part of Officer Gray's training protocol, he was not there to act as Officer Gray's backup but instead to observe and suggest steps Officer Gray needed to take. Be that as it may, police field training protocol cannot trump a citizen's constitutional rights. Wells had a right for the traffic stop to be conducted as expeditiously as possible.

Simply put, we cannot say Wells's actions and responses constituted reasonable suspicion of criminal activity justifying a significant extension of the traffic stop. As such, the dog sniff of his vehicle and ensuing search was the result of an unconstitutional seizure.

### Conclusion

The trial court improperly denied Wells's motion to suppress. We reverse.

Reversed.

MATHIAS, J., and BROWN, J., concur.

---

4. As for the shotgun in the vehicle, Officer Brink said it was not illegal for Wells to possess it, and the officers would have allowed Wells to leave and would have watched him closely as he drove away to make sure he did not attempt to access it.