## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 26 2020, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony S. Churchward
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kewan Ramseur,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 26, 2020

Court of Appeals Case No.
19A-CR-1513

Appeal from the Whitley Circuit Court

The Honorable Matthew J. Rentschler, Judge

Trial Court Cause No.
92C01-1804-F2-69

**Tavitas, Judge.**

## Case Summary

[1] Kewan Ramseur challenges his conviction for dealing in cocaine, a Level 2 felony. We affirm.

## Issue

[2] Ramseur raises one issue on appeal, which we restate as whether the trial court properly admitted evidence found as a result of an open air canine sniff.

## Facts

[3] On April 30, 2018, Ryan Taliaferro drove Ramseur from Fort Wayne to Chicago in Taliaferro's vehicle. While in Chicago, Ramseur and Taliaferro stopped at an unidentified location. Ramseur made a phone call, left the vehicle, and "met a guy" while Taliaferro remained in the vehicle. Tr. Vol. II p. 11. Taliaferro believed that Ramseur was out of the vehicle for about ten to fifteen minutes. Ramseur then placed a backpack in the trunk of Taliaferro's vehicle, and the pair then began the trip back to Fort Wayne.

[4] On the return trip to Fort Wayne, Officer Garry Archbold, with the Columbia City Police Department, observed Taliaferro traveling forty-five miles per hour in a sixty miles per hour zone. Officer Archbold also observed Taliaferro cross the fog line by "approximately half a car width." *Id.* at 159. Officer Archbold initiated a traffic stop and obtained identification from both Taliaferro and

Ramseur.[1] Officer Archbold requested that Taliaferro join Officer Archbold in his vehicle—which was Officer Archbold's standard procedure—while he processed their licenses through his computer system.

[5] While in his police vehicle, Officer Archbold observed that Taliaferro was speaking a lot and seemed nervous. Taliaferro told Officer Archbold that she and Ramseur went to Chicago briefly to drop off Taliaferro's eight-year-old son at his father's home. Officer Archbold asked Taliaferro to remain in the police vehicle while he returned Ramseur's driver's license and spoke with Ramseur. When questioned, Ramseur relayed to Officer Archbold that he and Taliaferro went to visit his family in Illinois and also stopped in Valparaiso. Officer Archbold noted the inconsistencies in Taliaferro's and Ramseur's versions of the day's events.

[6] Officer Archbold became suspicious of criminal activity based on the "totality of . . . all the circumstances that were happening." *Id.* at 40. Those circumstances included: Taliaferro's slow speed; Taliaferro's nervousness; the quick turnaround time in Chicago; and the inconsistencies between Ramseur's and Taliaferro's stories, which led Officer Archbold to believe one or both were lying. Based on his twenty years of law enforcement experience, Officer Archbold suspected the purpose of the brief trip to Chicago was drug related.

---

[1] Officer Archbold conducted a traffic stop "to make sure that there was no kind of impairment or any criminal activity afoot." Tr. Vol. II p. 159. Officer Archbold ultimately determined, however, that an investigation for operating while intoxicated was not needed.

[7] Officer Archbold returned to his vehicle and, after providing Taliaferro with a warning ticket, asked Taliaferro if she would answer additional questions. Taliaferro, who had already opened the door to Officer Archbold's vehicle to exit, closed the door and remained inside the vehicle. Officer Archbold asked Taliaferro whether any illegal substances were in the vehicle and asked for Taliaferro's permission to search the vehicle. Taliaferro declined and told Officer Archbold that she was tired and wanted to go home. Subsequently, Officer Archbold instructed Taliaferro to remain in his vehicle while Officer Archbold walked around Taliaferro's vehicle with Officer Archbold's canine officer.

[8] While Officer Archbold was working with the canine officer, Officer Valentic, with the Columbia City Police Department, arrived to assist. While conducting the open air sniff, the canine officer reacted to the presence of illegal substances in the vehicle; as a result, Officer Archbold searched Taliaferro's vehicle.[2] The search yielded marijuana in Taliaferro's purse and three kilograms of cocaine in a backpack located in the trunk of the vehicle. The entire stop, up until the canine alerted, lasted approximately fourteen to fifteen minutes according to Officer Archbold's body camera.

[9] On April 30, 2018, the State charged Ramseur with Count I, dealing in cocaine, a Level 2 felony; and Count II, possession of cocaine, a Level 3 felony. On

---

[2] Also, while the canine was conducting the open air sniff, Officer Valentic testified that he observed Ramseur ingest marijuana; therefore, Officer Valentic placed Ramseur under arrest.

March 5, 2019, Ramseur filed a motion to suppress "any and all evidence" seized from the vehicle after the canine sniff, arguing the traffic stop violated the prohibition on illegal searches and seizures under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Appellant's App. Vol. II p. 46.

[10] The trial court held a motion to suppress hearing on April 18, 2019. Witnesses testified to the foregoing facts. On April 22, 2019, the trial court entered an order denying Ramseur's motion to suppress and found in relevant part:

> 20. Because Ms. Taliaferro clearly wanted the stop to end and did not leave the scene because she thought that it would not be permitted, the Court finds that the events following the issuance of the written warning were not a consensual encounter. Ms. Taliaferro was explicit with the officer that she was tired and just wanted to go home and go to sleep. When the officer determined he was not going to get consent, he told Ms. Taliaferro to "sit tight for me." This was an explicit instruction to remain in his squad car. As such, it is determinative that Ms. Taliaferro was not free to leave and did not have a subjective belief that she was free to leave.
>
> * * * * *
>
> 22. The Officer was cognizant of the following facts which led him to utilize his drug dog to conduct a free air sniff:
>
> > a. *The slow speed of the vehicle and the swerving behavior.* The officer would have found the speed especially noteworthy when assessing whether the driver was being especially careful to avoid being pulled over that night.

b. *Ms. Taliaferro's nervous talking.* Police officers are experienced in evaluating people who are undergoing a traffic stop. Here Officer Archbold did note that Ms. Taliaferro was saying much more than necessary during their interactions and he took it as a sign of extraordinary nervousness.

c. *Different stories.* Ms. Taliaferro indicated they went to Chicago to transport her son there. Mr. Ramseur indicated they went to Illinois to see his family, then stopped in Valparaiso on the way home. The stories were not consistent and added to the officer's suspicions.

d. *Short visit to Chicago.* Officer Archbold testified that his suspicions were aroused by the extremely short trip from Fort Wayne to Chicago and back as this is sometimes indicative of drug-trafficking activity. . . .

23. Because the dog was already present in Officer Archbold's vehicle, the additional time required was minimal and minimally intrusive on the vehicle occupant's privacy. *See Illinois v. Caballes*, 543 U.S. 405 (2005), (the use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests. (citation omitted)).

24. The Court finds that there was sufficient reasonable suspicion to justify an additional two minutes to seek consent and one additional minute to then conduct the dog sniff after the eleven initial minutes of the traffic stop. Thus, the events were not violative of the United States Constitution.

*Id.* at 55-57.

During the May 2019 jury trial, Ramseur objected to Officer Archbold's testimony regarding the events of the traffic stop. The trial court overruled the objection. The jury found Ramseur guilty of both counts, but the trial court vacated the conviction for Count II as a lesser-included offense. In June 2019, the trial court sentenced Ramseur to eighteen years in the DOC, with four years suspended to probation. Ramseur now appeals his conviction.

## Analysis

Ramseur argues that Officer Archbold's use of the canine officer violated Ramseur's rights under the Fourth Amendment of the United States Constitution.[3] There are three separate time periods in this particular search and seizure: (1) the traffic stop;[4] (2) the detention after the traffic stop was

---

[3] Ramseur also argued, in support of his motion to suppress, that the search was improper under Article 1, Section 11 of the Indiana Constitution. In analyzing a canine sniff under Article 1, Section 11 of the Indiana Constitution, we would conduct the reasonableness test by balancing: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities, and 3) the extent of law enforcement needs." *State v. Gibson,* 886 N.E.2d 639, 643 (Ind. Ct. App. 2008). Ramseur, however, does not make the Indiana Constitution argument in his brief. Ramseur was required to make a specific Indiana Constitution argument in his brief in order for us to address the argument. *See Abel v. State,* 773 N.E.2d 276, 278 n.1 (Ind. 2002) ("Because Abel presents no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived."). Accordingly, we agree with the State that this argument is waived. *See* Ind. Appellate Rule 46(A).

[4] Ramseur "does not dispute that the vehicle in which he was a passenger was validly pulled over for crossing the fog line." Appellant's Br. p. 12.

completed and during the canine sniff;[5] and (3) the search of the vehicle itself.[6] Ramseur's argument is limited to the second period of time, and Ramseur specifically argues that law enforcement did not have reasonable suspicion under the Fourth Amendment to conduct a canine open air sniff after the purpose of the traffic stop was complete.

[13] Because Ramseur appeals from a completed jury trial rather than the denial of his motion to suppress, the issue is more appropriately framed as whether the trial court properly admitted the evidence at trial. *See Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Id.* at 259-60. "We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* at 260. "However, when a challenge to an evidentiary ruling is predicated on the constitutionality of a search or seizure of evidence, it raises a question of law that is reviewed de novo." *Curry v. State, 90 N.E.3d 677, 683 (Ind. Ct. App. 2017), trans. denied* (citations omitted). "The

---

[5] This is the time period to which Ramseur's argument is limited. Ramseur can properly contest this portion of the stop under the Fourth Amendment because Ramseur was "essentially seized when [Taliaferro, the driver, was] seized." *Campos v. State,* 885 N.E.2d 590, 598 (Ind. 2008).

[6] Ramseur is unable to challenge a search of the vehicle itself after the canine alerted because passengers in vehicles driven by the owners do not have standing to challenge a search of the vehicle. *See Campos,* 885 N.E.2d at 598. The search occurred, however, as a result of the canine sniff, which is the basis of Ramseur's objection to the admission of evidence.

State has the burden to demonstrate that the measures it used to seize information or evidence were constitutional." *Id.*

[14] The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by prohibiting them without a warrant supported by probable cause. U.S. Const. amend. IV. "The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006). This protection has been "extended to the states through the Fourteenth Amendment." *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). "As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure absent evidence of a recognized exception." *Clark*, 994 N.E.2d at 260.

[15] With respect to the Fourth Amendment and canine sniffs, in *Curry v. State,* 90 N.E.3d 677, 783-85 (Ind. Ct. App. 2017), *trans. denied,* a panel of our Court summarized the law as follows:

> [A] dog sniff is not a search protected by the Fourth Amendment. *State v. Hobbs*, 933 N.E.2d 1281, 1286 (Ind. 2010) (citing *Illinois v. Caballes*, 543 U.S. 405, 490, 125 S. Ct. 834, 160 L.Ed.2d 842 (2005)). Therefore, "no degree of suspicion is required to summon the canine unit to the scene to conduct an exterior sniff of the car or to conduct the sniff itself." *Id.* A narcotics dog sweep "is an unreasonable investigatory detention if the motorist is held for longer than necessary to complete the officer's work

related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity." *Austin* [*v. State*], 997 N.E.2d [1027,] 1034 [(Ind. 2013)].

\* \* \* \* \*

"A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407, 125 S. Ct. 834. . . . The critical question is not whether the sniff occurs before or after the officer issues a ticket, but whether conducting the sniff prolongs or adds time to the stop. *Id.* at 1616. The burden is on the State to show the time for the traffic stop was not increased due to a canine sniff. *Wells v. State*, 922 N.E.2d 697, 700 (Ind. Ct. App. 2010), *trans. denied*.

\* \* \* \* \*

We acknowledged that the Fourth Amendment can be implicated in the face of undue delay. "The [*Caballes*] Court indicated the Fourth Amendment would be violated if a traffic stop were unreasonably prolonged in order for a canine sniff to be carried out, because absent reasonable suspicion of criminal activity in addition to the traffic violation, the driver would be unlawfully detained at that point." *Id.* at 790 (citing *Caballes*, 543 U.S. at 407-08, 125 S. Ct. 834). The *Bush* [*v. State,* 925 N.E.2d 787 (Ind. Ct. App. 2010)] Court observed that cases applying *Caballes* fall within two groups: (1) the canine sniff was a proper incident to a valid traffic stop, having taken place before the purpose of the traffic stop was complete or (2) the purpose of the traffic stop was complete or officers significantly prolonged the stop for the canine unit to arrive. 925 N.E.2d at 790.

Here, Officer Archbold issued the warning ticket and asked Taliaferro to stay and answer additional questions. [7] The canine open air sniff then occurred. Ramseur concedes that the stop was prolonged only for a "short duration." Appellant's Br. p. 10. Nonetheless, the purpose of the traffic stop was complete when the warning ticket was issued; therefore, continuing the traffic stop for any additional period of time required reasonable suspicion. *See Rodriguez v. United States,* 575 U.S. 348, 350-51, 135 S. Ct. 1609, 1612 (2015). ("A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful [under the Fourth Amendment] if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.") (quotations omitted); *see also Wells v. State,* 922 N.E.2d 697, 700 (Ind. Ct. App. 2010) ("Although a dog sniff is not a search, an officer must have reasonable suspicion of criminal activity in order to detain an individual beyond what is necessary to complete a traffic stop related to the reason for that stop."); *see also Bush,* 925 N.E.2d at 791 (holding that, when the canine sniff was not part of the traffic stop, the court "must determine whether the officers had reasonable suspicion Bush or his passenger were engaged in criminal activity so as to justify prolonging Bush's detention").

---

[7] The trial court found that the interaction was not consensual because Taliaferro "was not free to leave and did not have a subjective belief that she was free to leave[,]" and the State does not challenge this finding. Appellant's App. Vol. II p. 55. The State does, however, point out that Officer Archbold did not ask Taliaferro to close the door to Officer Archbold's police vehicle and that Taliaferro did so voluntarily.

[17]   Accordingly, we must determine "whether the officer[] had reasonable suspicion of criminal activity" under the Fourth Amendment. *Curry,* 90 N.E.3d at 685 (citing *Bush,* 925 N.E.2d at 791). Under the Fourth Amendment:

> Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, but it still requires at least a minimal level of objective justification and more than an inchoate and unparticularized suspicion or hunch of criminal activity. Thus, a reviewing court must examine the totality of circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.

*State v. Gray,* 997 N.E.2d 1147, 1153 (Ind. Ct. App. 2013) (internal quotations and citations omitted). Here, Officer Archbold testified to four grounds to support his reasonable suspicion: the slow speed of the vehicle; Taliaferro's nervousness; the short trip to Chicago; and Taliaferro's and Ramseur's conflicting stories regarding their activities that day.

[18]   Ramseur compares his case to *Wilson v. State,* 847 N.E.2d 1064, 1065 (Ind. Ct. App. 2006), and *D.K. v. State,* 736 N.E.2d 758, 760 (Ind. Ct. App. 2000), in which the Fourth Amendment arguments were similarly raised. In *Wilson,* the defendant was also subjected to a traffic stop. During the stop, officers noticed the defendant was nervous, and after running the defendant's identification, officers discovered the defendant was previously convicted of a misdemeanor drug offense. Officers issued a warning ticket at 2:06 a.m., and officers then asked the defendant to step out of his vehicle. After the defendant

acknowledged he had a knife and $4,000.00 cash in his pocket, officers requested permission to search the vehicle, which the defendant declined. At 2:15 a.m., officers called for a canine officer.[8] Despite mentioning several times that he was cold, the defendant did not want officers to get his jacket from the vehicle.

[19] In finding that officers did not possess reasonable suspicion under the Fourth Amendment, a panel of our Court concluded that:

> A person's nervousness when stopped by the police at 2:00 a.m. is understandable, as is watching a passing patrol car. Carrying $4,000.00 in cash is unusual, but it is not illegal. [The officers] did not have reasonable suspicion to detain [the defendant] after the traffic stop was concluded and until the arrival of a drug-sniffing dog that was summoned only after [the defendant] declined to consent to a search.

*Wilson,* 847 N.E.2d at 1068.

[20] Similarly, in *D.K.*,[9] law enforcement conducted a traffic stop of the juvenile driver. Officers observed that: the juvenile initially would not roll down his

---

[8] In *Wilson,* the State also argued that Wilson gave the officer conflicting stories because, when Wilson was standing outside the vehicle, he said there were no weapons inside the vehicle; however, Wilson later admitted to having a pocket knife on his person. Our Court held that these comments were not contradictory and admonished the State for mischaracterizing the record.

[9] In *McLain v. State,* 963 N.E.2d 662, 667 (Ind. Ct. App. 2012), this Court recognized that "[t]he case upon which the *D.K.* court relied, *United States v. Mesa,* 62 F.3d 159 (6th Cir. 1995), has since been explicitly rejected by the Sixth Circuit based on a 1996 U.S. Supreme Court case." Therefore, according to *McLain,* "*D.K.* is no longer good law" on its analysis regarding law enforcement detaining a vehicle or its occupants after the purpose of the initial traffic stop has been completed. Regardless, we find this case distinguishable.

window; the two passengers in the vehicle would not make eye contact with officers; the juvenile had a police radio in his car; and the juvenile and passengers frequently turned around and looked at the officer while he was checking the license and registration. After issuing a verbal warning, the officers asked the juvenile driver if he had any weapons or illegal substances and asked to search the vehicle. The juvenile declined, and the officer retrieved his canine officer from his vehicle and walked around the juvenile's vehicle. The canine officer alerted to illegal substances.

[21] In finding no reasonable suspicion existed, our Court held:

> As to the initial failure to roll down the window, subsequently doing so should have dispelled any suspicion that this act would reveal the odor of narcotics. [Officers] testified that most people are nervous during a traffic stop. As to the failure to make eye contact, it seems likely that direct eye contact by all occupants could have also been interpreted negatively by the officer—as exhibiting hostility. As to the occupants' turning around to look at him, no suggestion has been made as to how this indicates the likelihood of illegal activity. Finally, [officers] testified that the information about a police radio in [the juvenile's] car had "no[thing] whatsoever" to do with his asking [the juvenile] about weapons or narcotics in the vehicle. Upon reviewing these facts articulated by Officer Johnson, facts existing before the officer informed [the juvenile] that there would be no traffic citation, we do not find them to create a reasonable suspicion of criminal activity to support continued detention for investigation.

*Id.* at 761-62.

[22] On the other hand, the State points to *Finger v. State,* 799 N.E.2d 528 (Ind. 2003), to support its argument that Officer Archbold had reasonable suspicion.[10] In *Finger,* Officer Richard Young, with the Butler University Police Department, was dispatched after an anonymous call was received regarding a report of a "suspicious vehicle." *Finger,* 799 N.E.2d at 530. Officer Young discovered two occupants in a vehicle parked partially in a driving lane just past an intersection. *Id.* The defendant told Officer Young that the car was out of fuel, and the pair was waiting on someone to bring gasoline. Officer Young knew a gas station was around the corner and saw the fuel gauge indicated approximately one-eighth of a tank of gas remaining in the vehicle. Officer Young also noticed the defendant was nervous. Officer Young testified at a motion to suppress hearing that the occupants "produced inconsistencies" in their information. *Id.* at 531. Officer Young observed in plain view a knife on the back seat and ammunition in the front seat of the vehicle. The occupants indicated they did not know who owned the items, and Officer Young became suspicious.

[23] Approximately fifteen or twenty minutes later, Officer Young heard a report of an armed robbery at a liquor store approximately one block away. Officer Young instructed both occupants to exit the vehicle, read the occupants their *Miranda* rights, and arrested them. The defendant filed a motion to suppress

---

[10] *Finger* does not involve a canine sniff; however, the case discusses facts necessary to support a finding of reasonable suspicion under the Fourth Amendment.

statements made in an interview with officers after the defendant's arrest and to suppress admission of the knife and ammunition found in the vehicle. The defendant argued that he was unlawfully detained under the Fourth Amendment and the Indiana Constitution. Officer Young pointed to the following facts to support his reasonable suspicion for the investigative stop:[11] (1) the report of the suspicious vehicle; (2) the defendant reported being out of fuel, but he had one-eighth of a tank of gas remaining and a gas station was just around the corner; (3) the occupants' inconsistent stories; (4) a folded pocketknife was in plain view in the car; and (5) the vehicle's passengers were nervous. The trial court denied the defendant's motion, and our Court reversed the trial court's order denying the motion to suppress.

[24] On transfer, our Supreme Court held that Officer Young had reasonable suspicion to prolong the stop. In doing so, the Court gave little weight to the anonymous call of a suspicious vehicle and the passengers' nervousness. Still, the Court found "a set of individually innocent facts, when observed in conjunction, can be sufficient to create reasonable suspicion of criminal activity." *Id.* at 534 (citations omitted).

[25] Now, we turn to the four circumstances Officer Archbold identified at the hearing on the motion to suppress to support his reasonable suspicion. First,

---

[11] Our Supreme Court found that "retention of the driver's license converted a consensual encounter [for Officer Young to aid the defendant's supposedly stranded vehicle] into an investigative stop," and thus, Officer Young needed reasonable suspicion to prolong the stop. *Finger,* 799 N.E.2d at 533.

Officer Archbold identified the slow speed of the vehicle. Once Taliaferro crossed the fog line by half a car width, Officer Archbold initiated the traffic stop. The trial court found it would have been reasonable for Officer Archbold to interpret the slow speed as Taliaferro's attempt to avoid interaction with law enforcement.

[26] Second, Officer Archbold identified Taliaferro's nervousness during the stop as suspicious. Our Supreme Court acknowledged that "nervousness is of limited significance when determining reasonable suspicion . . . it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." *Finger,* 799 N.E.2d at 534 (quotations and citations omitted). Nervousness alone would not be sufficient to support reasonable suspicion of criminal activity; this, however, does not render nervousness irrelevant. Instead, Taliaferro's nervousness must be considered in conjunction with other factors.

[27] Third, as to Ramseur's short trip to Chicago, Officer Archbold testified that, in his twenty years of experience, those who travel to Chicago for a brief visit of approximately ten to fifteen minutes are typically making a drug-related transaction. After Ramseur's account of the day's events conflicted with Taliaferro's, Officer Archbold sought Taliaferro's permission to search the vehicle, which she declined.

[28] Finally, Officer Archbold identified Ramseur's and Taliaferro's inconsistent stories. Ramseur argues that conflicting stories do not trigger reasonable

suspicion. As in *Finger,* "[d]eceptive responses may contribute to reasonable suspicion of criminal activity." *Finger,* 799 N.E.2d at 534. Accordingly, the inconsistent and deceptive stories were a proper factor to support reasonable suspicion along with the other circumstances identified by Officer Archbold.

[29] Given Taliaferro's slow speed, Taliaferro's nervousness, the quick turnaround time in Chicago, and the inconsistencies between Ramseur's and Taliaferro's stories, we conclude that the circumstances here are more like those in *Finger* than in *Wilson* or *D.K.* Under the totality of the circumstances, we conclude that the brief canine sniff was proper under the Fourth Amendment because the officer had reasonable suspicion of criminal activity.

## Conclusion

[30] The officer had reasonable suspicion to support the canine sniff, which did not violate Ramseur's rights under the Fourth Amendment. The trial court did not abuse its discretion in admitting the evidence. Accordingly, we affirm.

[31] Affirmed.

May, J., and Vaidik, J., concur.