

FILED

Nov 02 2023, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachary J. Stock
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

Catherine Brizzi
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James Earnest Ramsey,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | November 2, 2023<br><br>Court of Appeals Case No.<br>22A-CR-2877<br><br>Appeal from the Hendricks<br>Superior Court<br><br>The Honorable Rhett M. Stuard,<br>Judge<br><br>Trial Court Cause No.<br>32D02-1908-F2-28 |

**Opinion by Judge May**
Chief Judge Altice and Judge Tavitas concur.

**May, Judge.**

James Earnest Ramsey appeals his convictions of Level 2 felony dealing in methamphetamine,[1] Level 6 felony possession of methamphetamine,[2] and Class C misdemeanor possession of paraphernalia.[3]  He argues the trial court abused its discretion when it admitted the drugs and paraphernalia found in Ramsey's vehicle after a traffic stop.  He presents two arguments for our consideration, which we restate as:

1. Whether the search of Ramsey's vehicle violated his Fourth Amendment rights against illegal search and seizure because the dog sniff of his vehicle unreasonably prolonged the traffic stop without the officer having reasonable suspicion to keep Ramsey on the scene; and

2. Whether the search of Ramsey's vehicle violated his rights against illegal search and seizure under Article 1, Section 11.

We affirm.

## Facts and Procedural History[4]

On August 5, 2019, Sergeant Jeffrey Slayback of the Danville Police Department was "running plates" at a Circle K gas station in Danville.  (Tr.

---

[1] Ind. Code § 35-48-4-1.1.

[2] Ind. Code § 35-48-4-6.1.

[3] Ind. Code § 35-48-4-8.3.

[4] We held oral argument in this case on September 27, 2023, as part of the Indiana Bar Foundation's "Behind the Curtain: The Judiciary" program.  We thank the Indiana Bar Foundation for organizing the event, the high school and middle school teachers from around Indiana for attending, and counsel for their able presentations.

Vol. II at 163.) Sergeant Slayback was in his police car with his drug-sniffing dog, Zeke. Ramsey's vehicle was parked in the lot. Sergeant Slayback ran the temporary plate on Ramsey's vehicle. He discovered Ramsey was the owner of the vehicle, had a suspended license, and had been reported missing. Because Ramsey had a suspended license and was reported missing, Sergeant Slayback followed Ramsey after Ramsey returned to his vehicle and drove away. After he left the gas station, Ramsey failed to stop at a stop sign before turning right, and Sergeant Slayback observed him "weaving in his lane, um he crossed over the center line several times, left over the center line." (*Id*. at 170.) Based thereon, Sergeant Slayback initiated a traffic stop.

[3] Sergeant Slayback approached the vehicle and talked to Ramsey, who gave Sergeant Slayback his driver's license. Sergeant Slayback explained the reason for his stop – the traffic infractions and the suspended license – as well as the fact that Ramsey was listed as a missing person. While he was talking to Ramsey, Sergeant Slayback observed "an open cut above [Ramsey's] eye. Pretty large cut. Looked like it had occurred pretty recently." (*Id*. at 179.) Ramsey told Sergeant Slayback that he had suffered a seizure earlier in the day. Sergeant Slayback offered Ramsey medical attention and Ramsey refused.

[4] Sergeant Slayback also noticed Ramsey was "grinding his teeth, um hands were shaking uncontrollably, um and he was having somewhat of a difficult time answering basic questions." (*Id*.) In addition, Ramsey "hesitat[ed] on most of the questions" Sergeant Slayback asked like "where he was headed to uh where he was coming from today, what had happened to his head." (*Id*.) The initial

conversation between Sergeant Slayback and Ramsey commenced less than a minute after Sergeant Slayback initiated the traffic stop. (*See* Ex. 4 at 00:45 - 1:36) (dashcam video of traffic stop). The conversation between Sergeant Slayback and Ramsey lasted for approximately one minute. (*See id*. at 1:37 - 2:27.)

[5]   Sergeant Slayback returned to his vehicle and ran Ramsey's driver's license through the appropriate databases, which took "probably thirty seconds to a minute maybe." (Tr. Vol. II at 180.) Sergeant Slayback then tried "to get more information on the missing person" report like "who had reported him missing uh and uh start trying to gather some information from that and confirming that his license status was in fact suspended." (*Id*. at 181.) Sergeant Slayback was in his car for approximately three minutes performing these tasks. (*See* Ex. 4 at 2:28 - 5:10.)

[6]   Sergeant Slayback returned to Ramsey's vehicle and told Ramsey that Sergeant Slayback had confirmed that Ramsey was a missing person. Ramsey told Sergeant Slayback that he believed his wife reported him missing because "he hadn't been home in several months and she was . . . upset with him." (Tr. Vol. II at 181.) Ramsey told Sergeant Slayback that "he was surprised he had been reported missing" and that he was under the impression that his driver's license was valid. (*Id*.) This encounter was "a little more lengthy cause [sic] we had some more in-depth conversations about the license status, the stopping charges and then the missing person thing." (*Id*. at 182.)

[7] During the second encounter, Sergeant Slayback observed Ramsey's hands were shaky and he continued to grind his teeth. Ramsey's speech was also slurred. Sergeant Slayback told Ramsey "to call someone to come and get him because he wasn't capable of driving at this point because of his license status." (*Id*. at 186.) This conversation lasted less than four minutes. (*See* Ex. 4. at 5:11 - 7:53.)

[8] Sergeant Slayback returned to his car to further investigate the missing person report. While in his car, Sergeant Slayback had the police department's communication center contact the missing person reporting agency to get more information on the person who reported Ramsey missing, so Sergeant Slayback could contact that person. By that time, he had also requested a second officer come to the scene because he had "developed some sort of reasonable suspicion or some level of reasonable suspicion. Uh just based on his behavior . . . [he thought there was] possible drug activity or some kind of impairment." (Tr. Vol. II at 182.) Sergeant Slayback learned Ramsey's wife reported him missing and Sergeant Slayback tried to call her, though it is unclear if he spoke with her. This process took approximately one minute. (*See* Ex. 4 at 7:54 - 8:58.)

[9] Sergeant Slayback returned to Ramsey's vehicle to ask additional questions regarding Ramsey's suspected "drug activity or impairment." (Tr. Vol. II at 187.) Sergeant Slayback asked Ramsey if he had any illegal substances in his vehicle or if he had used any "stimulants or things of that nature" that day. (*Id*.) Ramsey denied feeling overstimulated and told Sergeant Slayback he did not have anything illegal inside his vehicle. Sergeant Slayback asked Ramsey to

exit his vehicle, and Ramsey did so.  This encounter took less than two minutes.  (*See* Ex. 4 at 8:59-10:36.)

[10]     Sergeant Slayback returned to his police vehicle and removed his drug sniffing dog Zeke, from his car.  Zeke was trained to detect the odor of "marijuana, methamphetamine, cocaine, heroin, [and] ecstasy" (Tr. Vol. II at 199), by "methodically sniff[ing] his way down the vehicle."  (*Id*. at 198.)  Sergeant Slayback took Zeke around the front of the vehicle and the dog "gave a positive identification" on the driver's side door of the vehicle.  (*Id*.)

[11]     During the subsequent search, Sergeant Slayback found in the center console of the vehicle "a glass smoking pipe that appeared to have some kind of white residue in it, along with a small uh clear Ziploc baggie that contained a white crystalized substance" that Sergeant Slayback identified as methamphetamine.  (*Id*. at 206.)  The time from Ramsey's exit from his vehicle until Seargeant Slayback's deployment of the dog was less than two minutes.  (*See* Ex. 4 at 10:37 - 11:50.)  The entire time elapsed from the initiation of the stop until Sergeant Slayback deployed the dog was almost exactly eleven minutes.  (*See id*. at :45 - 11:50.)

[12]     Sergeant Slayback put Ramsey under arrest and advised him of his *Miranda*[5] rights.  Ramsey agreed to speak to Sergeant Slayback, and he "denied knowing what was in the vehicle."  (Tr. Vol. II at 208.)  Sergeant Slayback returned to

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966), *reh'g denied*.

the vehicle and continued to search. Therein, he found a toolbox containing "a set of scales, um and then a larger baggie . . . [with] a white . . . powdery substance" in it. (*Id*. at 209.) Ramsey told Sergeant Slayback he did not know why those items were in his vehicle. He claimed his vehicle was stolen in June, but Sergeant Slayback could not find a stolen vehicle report for the vehicle. He also told Sergeant Slayback that maybe his aunt left something in the car. When asked about the white powdery substance, Ramsey told Sergeant Slayback the substance was "possibly cocaine and/or sugar." (*Id*. at 216.) The substance was later determined to be methamphetamine.

[13] Sergeant Slayback placed Ramsey in his vehicle and took him to the hospital for treatment of the laceration on Ramsey's face. On the way to the hospital, Ramsey told Sergeant Slayback "he was scheduled to pick up and drop off several pounds of methamphetamine [to] and from Anderson." (*Id*. at 223.) Ramsey then alluded "several times to finding bigger drug dealers . . . [and] also alluded to knowing several people who had committed homicides in Marion County by name and he could give [Sergeant Slayback] those names" in an effort to "get out of the charges that their [sic] on by giving up someone else." (*Id*.)

[14] On August 6, 2019, the State charged Ramsey with Level 2 felony dealing in cocaine, Level 4 felony possession of cocaine,[6] Level 6 felony possession of

---

[6] Ind. Code § 35-48-4-6(c).

methamphetamine, and Class C misdemeanor possession of paraphernalia. The State later added a charge of Level 2 felony dealing in methamphetamine and alleged Ramsey was a habitual offender. On June 2, 2020, Ramsey filed a motion to suppress the items found in his vehicle. On August 4, 2020, the trial court held a suppression hearing. On September 14, 2020, the trial court summarily denied Ramsey's motion to suppress.

[15]     On January 1, 2022, Ramsey filed a written waiver of his right to a jury trial. On May 19 and June 9, 2022, the trial court held a bifurcated bench trial. The State dismissed the cocaine-related charges at the start of the bench trial. At the end of the bench trial, the trial court found Ramsey guilty of Level 2 felony dealing in methamphetamine, Level 6 felony possession of methamphetamine, and Class C misdemeanor possession of paraphernalia. On November 4, 2022, the trial court sentenced Ramsey to sixty days for the misdemeanor, one year for the Level 6 felony, and twenty-five years for the Level 2 felony, and the court ordered the sentences served concurrently. The trial court enhanced the sentence for the Level 2 felony by ten years after it determined Ramsey was a habitual offender. Thus, the court imposed an aggregate sentence of thirty-five years executed in the Department of Correction.

## Discussion and Decision

[16]     Ramsey challenges the admission of the evidence found as part of the traffic stop. He appeals following the trial court's admission of that evidence at trial

and the denial of his pre-trial motion to suppress the same evidence. Our standard of review in such a circumstance is well-settled:

> When ruling on the admission of evidence at trial following denial of a motion to suppress, a trial court must consider the foundational evidence presented at trial. It also considers evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. A trial court is in the best position to weigh the evidence and assess witness credibility, and we review its rulings on admissibility for an abuse of discretion and reverse only if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. However, the ultimate determination of the constitutionality of a search or seizure is a question of law that we review de novo.

*Gerth v. State*, 51 N.E.3d 368, 372 (Ind. Ct. App. 2016) (internal citations and quotation marks omitted).

## 1. Fourth Amendment

[17] The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by prohibiting them without a warrant supported by probable cause. To deter state actors from violating that prohibition, evidence obtained in violation of the Fourth Amendment generally is not admissible in a prosecution of the citizen whose right was violated. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). The State has the burden of demonstrating the admissibility of evidence collected during a seizure or search. *Id*.

A traffic stop is a seizure that must comply with the Fourth Amendment. *McLain v. State*, 963 N.E.2d 662, 666 (Ind. Ct. App. 2012), *trans. denied*. It is well-settled that a traffic stop "must be supported by, at least, reasonable suspicion that a traffic law has been violated or other criminal activity is afoot." *Bush v. State*, 925 N.E.2d 787, 790 (Ind. Ct. App. 2010), *clarified on reh'g* 929 N.E.2d 897 (Ind. Ct. App. 2010). An officer may stop and briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion of criminal activity, even if the officer lacks probable cause to make an arrest. *Armfield v. State*, 918 N.E.2d 316, 319 (Ind. 2009).

The existence of reasonable suspicion cannot be reduced to a neat set of legal rules. *Platt v. State*, 589 N.E.2d 222, 226 (Ind. 1992). Suspicious behavior is by its very nature ambiguous. *Id*. Therefore, we look to the totality of the circumstances surrounding a *Terry*[7] stop to determine whether it was supported by reasonable suspicion. *Paul v. State*, 189 N.E.3d 1146, 1154-55 (Ind. Ct. App. 2022), *trans. denied*. "Reasonable suspicion 'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id*. at 1155 (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014)). We expect officers to assess whether reasonable suspicion

---

[7] *Terry v. Ohio*, 392 U.S. 1 (1968).

exists by relying upon their training and experience as well as commonsense judgments and inferences about human behavior. *Id.*

[20] The "automobile exception" to the warrant requirement allows police to search a vehicle without obtaining a warrant if they have probable cause to believe the vehicle contains evidence of a crime. *State v. Hobbs*, 933 N.E.2d 1281, 1285 (Ind. 2010). Under this exception, "an operational vehicle is inherently mobile, whether or not a driver is behind the wheel or has ready access." *Id.* at 1286. A dog sniff of the exterior of the vehicle indicating the presence of illicit substances provides probable cause for a warrantless search of the interior of the vehicle under the automobile exception. *Id.*

[21] A "dog sniff" sweep of a vehicle is not a search protected by the Fourth Amendment. *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013). When a dog sniff occurs incident to a legitimate traffic stop and does not prolong the stop beyond what is necessary to complete the purpose of the traffic stop, no reasonable suspicion of drug-related activity is required. *Bush*, 925 N.E.2d at 790. If a dog sniff occurs after the completion of a traffic stop, an officer must have reasonable suspicion of criminal activity to proceed thereafter with an investigatory detention. *Bradshaw v. State*, 759 N.E.2d 271, 273 (Ind. Ct. App. 2001). The critical facts in determining whether a vehicle was legally detained at the time of the dog sweep are whether the traffic stop was concluded and, if so, whether there was reasonable suspicion at that point to continue to detain the vehicle for investigatory purposes. *Id.* at 273-4. The burden is on the State to show the time for the traffic stop was not increased due to the dog sweep. *Id.*

In assessing whether a detention is too long in duration, we examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. *Id.*

[22] Ramsey argues that while the traffic stop was legitimate, the dog sniff of his vehicle was not conducted within a reasonable amount of time and Sergeant Slayback did not have reasonable suspicion to prolong the traffic stop to perform the dog sniff. Specifically, he contends those tasks related to Sergeant Slayback's initial traffic stop were complete before Sergeant Slayback removed the police dog from his vehicle to conduct an open-air search of Ramsey's vehicle. Ramsey asserts Sergeant Slayback had three reasons to conduct the traffic stop: "(1) Slayback suspected [Ramsey] was operating with a suspended license; (2) Slayback was aware [Ramsey] had been reported missing; and (3) Slayback witnessed [Ramsey]'s commit [sic] of a minor traffic infraction." (Br. of Appellant at 10.)

[23] Regarding whether the dog sniff unreasonably lengthened the traffic stop, Ramsey argues the reasons for the stop were addressed within six minutes from when the traffic stop commenced – Sergeant Slayback could have written tickets or warnings for any traffic infraction; confirmed Ramsey's license was suspended and told Ramsey he would need a ride home because he could not drive; and confirmed Ramsey was a missing person and attempted to call the person who reported him missing. Based thereon, Ramsey contends the traffic stop should have already been completed and thus "anything that occurred

beyond that point constituted an unconstitutional detention, and the evidence obtained during the detention should have been excluded." (*Id.* at 10-11.)

[24] Ramsey likens the facts of his case to those in *Wells v. State*, 922 N.E.2d 697 (Ind. Ct. App. 2010), *trans. denied*. In *Wells*, two officers initiated a traffic stop because Wells was driving at a high rate of speed and had a cracked windshield. *Id.* at 699. The stop began at 11:45 a.m. *Id.* When they approached Wells's vehicle, they noticed he was "very nervous and fidgety" and one of the officers believed his behavior was consistent with methamphetamine use. *Id.* While in his police car entering Wells's information into the database, the officer saw Wells moving about in the car and "lean down entirely onto the passenger side of the vehicle" despite the fact that the officer told Wells to keep his hands on the steering wheel. *Id.*

[25] The officer returned to the car and asked Wells to step out of the vehicle. *Id.* The officer performed a pat down search and did not find any illegal substances or weapons. *Id.* The officer again asked Wells if there was anything in the car the officer should be concerned about. *Id.* Wells indicated there was a shotgun behind the front seat, but he would not allow the officer to remove it from the vehicle. *Id.* The officers then made Wells sit on a nearby curb and would not allow him back into his vehicle. *Id.*

[26] At 12:01 p.m., the officer entered the Vehicle Identification Number ("VIN") of Wells's vehicle and confirmed it was not stolen. *Id.* Shortly thereafter, the officer confirmed there were no outstanding warrants for Wells. *Id.* At 12:04

p.m. the officer called the K9 officer for backup. *Id.* At 12:08 p.m. the K9 officer indicated he was on the way to the scene and arrived approximately fifteen minutes later. *Id.* When the K9 officer arrived, the drug dog sniffed Wells's vehicle and alerted on it. *Id.* The officer then searched Wells's vehicle and found a shotgun and methamphetamine. *Id.* Officers arrested Wells, called a wrecker to tow his vehicle, and wrote a ticket for the cracked windshield. *Id.*

[27] Based thereon, the State charged Wells with Class C felony possession of methamphetamine and Class C felony possession of methamphetamine and a firearm. *Id.* Prior to trial, Wells filed a motion to suppress the evidence found in the vehicle. *Id.* The trial court held a hearing and subsequently denied the motion. *Id.* The case came to us on interlocutory appeal.

[28] On appeal, Wells argued the evidence in his vehicle was obtained in violation of his Fourth Amendment rights against unreasonable search and seizure. *Id.* at 700. Both parties acknowledged the time taken for the K9 officer to arrive on scene substantially lengthened the traffic stop. *Id.* However, Wells contended the officer did not have reasonable suspicion to call for a K9 officer and thus the officer should not have detained Wells any longer than needed to complete the traffic stop. *Id.* He asserted the officer had all the information he needed to write a ticket or a warning for the alleged traffic infractions before he called the K9 officer. *Id.*

[29] The State argued the officer had reasonable suspicion to detain Wells for approximately forty minutes after the beginning of the traffic stop because

"Wells's extreme nervousness and fidgetiness" was indicative of methamphetamine use. *Id*. at 701. The State also asserted Wells's furtive movements after the officer directed him to keep his hands on the wheel supported Wells's removal from the car for officer safety. *Id*. We noted we had "no qualms with the officers then deciding that Wells would not be permitted to re-enter his vehicle while the traffic stop was proceeding[,]" *id*., however, once those officer safety concerns were alleviated by the pat down search and Wells's removal from the vehicle, there was a lack of reasonable suspicion to continue Wells's detention while waiting additional time for the arrival of the K9 officer. *Id*. We noted the officer's testimony acknowledging that he could have called for a nearby officer for backup but chose instead to call the K9 officer, who was likely farther away than the closest backup officer. *Id*. at 701-2. The officer also testified that if he had called a regular backup officer, he would not have searched Wells's vehicle and Wells would have been free to leave. *Id*. at 702. Additionally, we noted there was another officer already on scene who could have acted as backup. *Id*. Based thereon, we reversed the denial of Wells's motion to suppress. *Id*.

[30] However, the situation here is drastically different than in *Wells*. In *Wells*, officers held Wells at the scene of the traffic stop for forty minutes while the officers waited for the K9 officer and dog to arrive on the scene. Here, Sergeant Slayback was a K9 officer, and his dog, Zeke, was on scene during the entire traffic stop, and only eleven minutes elapsed between the initiation of the traffic stop and the dog sniff. During those eleven minutes, Sergeant Slayback

investigated the status of Ramsey's driving license, the commission of an alleged traffic violation, and the missing person's report. Upon determining Ramsey's license was suspended, Sergeant Slayback directed Ramsey to "call someone to come get him because he wasn't capable of driving at this point because of his license status." (Tr. Vol. II at 186.) It is unclear from the record whether Ramsey called anyone to come get him, but no one had arrived to drive Ramsey and his vehicle from the scene by the time Sergeant Slayback began the dog sniff. Based thereon, we conclude the traffic stop was not unreasonably lengthened by the dog sniff.[8] *See Danh v. State*, 142 N.E.3d 1055, 1063 (Ind. Ct. App. 2020) (dog sniff performed by drug sniffing dog on the scene of the traffic stop lasting approximately ten minutes did not unreasonably prolong traffic stop), *trans. denied*.

## 2. Article 1, Section 11

[31] The language of Article 1, Section 11, the search and seizure provision of the Indiana Constitution, is virtually identical to its Fourth Amendment counterpart. Article 1, Section 11 provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly

---

[8] As the dog sniff did not unreasonably lengthen the duration of the traffic stop, we need not analyze whether Sergeant Slayback had reasonable suspicion to extend the stop.

describing the place to be searched, and the person or thing to be seized.

Our Indiana Supreme Court has interpreted and applied Section 11 independently from federal Fourth Amendment jurisprudence. *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001).

[32] To determine whether a search violates Article 1, Section 11 of the Indiana Constitution, we must evaluate the "reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). "The totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure." *Id*. at 360. In *Litchfield*, our Indiana Supreme Court summarized this evaluation:

> In sum, although we recognize there may well be other relevant considerations under the circumstances, we have explained reasonableness of a search or seizure as turning on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities, and 3) the extent of law enforcement needs.

*Id*. at 361.

[33] As to the first *Litchfield* factor - the degree of concern, suspicion, or knowledge that a violation has occurred - Ramsey contends Sergeant Slayback had a low degree of suspicion or knowledge that Ramsey was engaged in criminal activity. Ramsey contends "the alleged traffic violations were merely a type of

bootstrapping" and, while Sergeant Slayback had reasonable suspicion Ramsey was driving with a suspended license, that alone "did not authorize a fishing expedition." (Br. of Appellant at 15.) However, at the time of the traffic stop, Sergeant Slayback suspected Ramsey was driving with a suspended license and Ramsey had been reported missing. Further, Ramsey failed to stop at a stop sign before turning right and Sergeant Slayback observed him "weaving in his lane, um he crossed over the center line several times, left over the center line." (Tr. Vol. II at 170.) As Sergeant Slayback observed Ramsey commit traffic infractions and believed he was driving with a suspended license, we conclude Sergeant Slayback had a high degree of concern, suspicion, or knowledge that a violation had occurred. *See*, *e.g.*, *Moore v. State*, 211 N.E.3d 574, 581 (Ind. Ct. App. 2023) (officer had high degree of suspicion of criminal activity based on traffic violation and smell of burnt marijuana upon approaching defendant's vehicle).

[34]     Ramsey does not make an argument regarding the second *Litchfield* factor - the degree of intrusion the method of search imposes on a person's ordinary activities. However, our Indiana Supreme Court has held a traffic stop "amount[s] to a small intrusion" on a defendant's "ordinary activities." *Marshall v. State*, 117 N.E.3d 1254, 1262 (Ind. 2019). Further, the dog sniff itself was not a search and, particularly because the dog sniff occurred shortly after Ramsey was stopped, the intrusion into Ramsey's ordinary activities was minimal. *See Austin*, 997 N.E.2d at 1036 (dog sniff conducted shortly after a legitimate traffic stop did not intrude into defendant's ordinary activities).

[35]     Regarding the third *Litchfield* factor – the extent of law enforcement needs – Ramsey argues Sergeant Slayback did not have a compelling need to conduct a dog sniff of his vehicle. He contends that, because Sergeant Slayback knew he would be towing Ramsey's vehicle after discovering his license was suspended and thus he could not drive the vehicle, the police were "free to do with the vehicle as they saw fit, which would have included plenty of time to seek a search warrant." (Br. of Appellant at 15.) However, Sergeant Slayback's observation of Ramsey's intoxication after he made contact with Ramsey regarding the suspended license changed Sergeant Slayback's intention from a need to remove a suspended driver from the road to a need to remove an impaired person from the road. As Sergeant Slayback was reasonably certain criminal activity was occurring based on those observations, we conclude law enforcement needs were high. *See Crabtree v. State*, 199 N.E.3d 410, 417 (Ind. Ct. App. 2022) (law enforcement needs were high based on suspicion criminal activity was afoot after completing initial reason for investigation).

[36]     To summarize, Sergeant Slayback had a high degree of concern, suspicion, or knowledge that Ramsey violated traffic laws, including driving with a suspended license. Additionally, the dog sniff of the vehicle was minimally intrusive. Finally, Sergeant Slayback's law enforcement-related needs were high because there were multiple indicators that criminal activity was afoot. Based on the totality of those circumstances, we conclude the trial court did not abuse its discretion when it admitted the evidence found in Ramsey's vehicle because the search thereof did not violate Ramsey's rights against illegal search

and seizure under Article 1, Section 11 of the Indiana Constitution. *See Garcia v. State*, 47 N.E.3d 1196, 1199 (Ind. 2016) (based on the totality of the circumstances, search did not violate Article 1, Section 11 of the Indiana Constitution).

## Conclusion

[37]    Because the dog sniff did not unreasonably prolong the traffic stop, Ramsey's Fourth Amendment rights were not implicated and the trial court did not abuse its discretion when it admitted the evidence found in Ramsey's car. Further, the search of Ramsey's vehicle did not violate Article 1, Section 11 of the Indiana Constitution because Sergeant Slayback had high suspicion a crime had occurred, the dog sniff was minimally intrusive, and the law enforcement need was high. Accordingly, we affirm the trial court.

[38]    Affirmed.

Altice, C.J., and Tavitas, J., concur.